UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ST. JOHN'S UNIVERSITY, NEW YORK,

                  Plaintiff,

      -against-

SANFORD M. BOLTON, HYGROSOL
PHARMACEUTICAL CORP., and
SPIRIDON SPIREAS,

                  Defendants.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER**

**08-CV-5039 (NGG) (JMA)**

NICHOLAS G. GARAUFIS, United States District Judge.

        St. John's University ("Plaintiff" or "St. John's" or "the University") brings this action alleging that Sanford Bolton ("Bolton") and Spiridon Spireas ("Spireas") deliberately concealed, for nearly thirteen years, the fact that research they had conducted at the University had yielded patentable inventions to which the University was legally entitled. Bolton, Spireas, and Hygrosol Pharmaceutical Corp. ("Hygrosol") (collectively, "Defendants") move to dismiss the claims raised in the Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) for failure to state a claim for which relief may be granted and failure to plead fraud with particularity.

        For the reasons set forth below, Defendants' motions are denied.

## I.    FACTUAL ALLEGATIONS[1]

### A.    The Parties

        Bolton was a professor at St. John's from 1980 through his retirement in June 1994.

---

[1] Except where indicated below, the following allegations of fact are drawn from Plaintiff's Complaint and are accepted as true for purposes of deciding the motions to dismiss under Fed. R. Civ. P. 12(b)(6). All other facts are drawn from documents integral to the Complaint or of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

(Compl. (Docket Entry # 13) ¶¶ 28, 43.)  From 1985 through 1991, Bolton was the chairman of the Department of Pharmacology and Administrative Sciences in the St. John's College of Pharmacy and Allied Health Professions.  (Id. ¶¶ 43-44.)  As part of his responsibilities as an employee and faculty member at St. John's, Bolton conducted research of his own and directed the research of graduate students.  (Id. ¶¶ 23-26, 46-47.)

One such graduate student was Spireas, who completed a master's degree at St. John's College of Pharmacy and Allied Health Professions in September 1988, and a doctoral degree at St. John's in February 1993.  (Id. ¶¶ 20, 22.)  In his capacity as a faculty member, Dr. Bolton advised and directed Spireas in his doctoral dissertation research.  (Id. ¶¶ 22-27.)

### B.       Research into Liquisolid Systems and the Patents at Issue

Spireas's doctoral dissertation research at St. John's involved "liquisolid compacts," also known as "liquisolid systems," which are terms used to describe the powdered forms of liquid medications.  (McElroy Decl. (Docket Entry # 37-1) Ex. H at i-ii.)[2]  Liquid lipophilic and water-insoluble solid drugs can be converted to powdered form "by a simple admixture with selected powder excipients referred to as the carrier (*e.g.*, cellulose) and coating (*e.g.*, silica) materials." (Id. at ii.)  This admixture, the "liquisolid system," enhances the drug's "release profile" because "the wetting properties and/or surface of the drug available for dissolution are increased."  (Id.) But practical application of this principle had been hampered by "erratic flow and compression properties of the final admixtures."  (Id.)

Spireas theorized that "carrier and coating materials can retain only certain amounts of liquid while at the same time maintaining acceptable flow and compression properties."  (Id.)

_____

[2]       The dissertation and the research it describes are integral to the Complaint because Plaintiff relied on the dissertation and its description of the research in drafting the Complaint.  (See Compl. ¶¶ 22-25; Pl.'s Opp'n ("Opp.") (Docket Entry # 37) at 3 n.1.)  See Chambers, 282 F.3d at 153 ("[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion.") (emphasis in original).

Spireas confirmed this hypothesis through testing, and created a mathematical model to describe the amount of liquid that a particular liquisolid system could retain while maintaining acceptable flow and compression properties. (Id.) In demonstrating the validity of his model, Spireas produced liquisolid tablets of commercially available drugs, which in some cases exhibited "significantly higher drug release rates than those of their commercial counterparts." (Id. at ii-iii.)

Beginning in approximately January 1991 Spireas conducted at least some of this research off-campus at facilities owned by a third party, Ciba-Geigy Corporation ("Ciba-Geigy"). (Compl. ¶¶ 78-86.) While St. John's policies generally prohibited graduate students from conducting research off-campus, (McElroy Decl. Ex. F), Bolton helped Spireas obtain special permission from St. John's allowing him to use Ciba-Geigy's facilities for his dissertation research (Compl. ¶¶ 78-89). In a February 1991 letter to St. John's confirming that Ciba-Geigy had given Spireas permission to use its facilities, Ciba-Geigy stated that Spireas had confirmed that "the project will be directed by Dr. Sanford Bolton." (McElroy Decl. Ex. E.) Bolton likewise represented to St. John's in a March 1991 memorandum that he would be directing Spireas's research at Ciba-Geigy. (Compl. ¶ 82.) In the acknowledgments section of his dissertation, Spireas thanked his "major advisor, Dr. Sanford Bolton for his invaluable guidance, unlimited encouragement and support during the course of this project," and Ciba-Geigy, "for offering [him] the unique opportunity to conduct most of this research in their laboratories" and allowing him to use its "'state of the art' equipment." (McElroy Decl. Ex. H at v.)

Spireas submitted his doctoral dissertation in December 1992 (id. at i), and it was approved by Bolton in January 1993 (id.). Spireas received his doctorate from St. John's in February 1993 (Compl. ¶ 27). In June 1993, Bolton submitted his notice of retirement to St.

John's, and his teaching duties at the University ended in June 1994. (Id. ¶ 24.)

Bolton and Spireas filed their first patent application in June 1996 as joint inventors,[3] and their research at the University allegedly resulted in inventions which are the subjects of at least four patents.[4] (Id. ¶¶ 29-38; McElroy Decl. Exs. A-D.) Each of the four patent applications was entitled "Liquisolid systems and methods of preparing same," and Bolton and Spireas were both listed as inventors for all but one of the resulting patents (collectively, the "Liquisolid Patents"). (Compl. ¶¶ 29-32.)

## C.    Hygrosol and Defendants' Efforts to License the Liquisolid Patents

Bolton and Spireas formed Hygrosol in January 1997 and have been its only shareholders from its inception. (Id. ¶¶ 156, 161-62, 313.) Bolton and Spireas assigned all four Liquisolid Patents to Hygrosol, allegedly without fair consideration. (Id. ¶¶ 156-57, 162, 313, 316.) Hygrosol then entered into agreements to license one or more of the Liquisolid Patents to a third party not named as a party in this action. (Id. ¶ 158.) Hygrosol has received at least $100 million in revenue from the licensing agreements, which has been transferred to Bolton and Spireas, and most of which Defendants received after January 2006. (Id. ¶¶ 159-60, 162.)

---

[3]    "Inventor" is a term of art under patent law, see, e.g., 35 U.S.C. § 111 (patent application to be filed by the inventor), and it is used as such in this Memorandum and Order.

[4]    Bolton and Spireas filed the first patent application, United States Patent Application No. 08/658,514 (the "'514 Application") in June 1996. (McElroy Decl. Ex. A.) In September 1998, the U.S. Patent and Trademark Office ("PTO") issued Patent No. 5,800,834 on the '514 Application (the "'834 Patent"). (Id.) Bolton and Spireas filed an application for a second patent in October 1997 and the PTO issued Patent No. 5,968,550 on the application in October 1999 (the "'550 Patent"). (McElroy Decl. Ex. B.) Bolton and Spireas filed an application for a third patent in August 1998 and the PTO issued Patent No. 6,096,337 on the application in August 2000 (the "'337 Patent"). (McElroy Decl. Ex. C.) Spireas filed an application for a fourth patent in May 2000 and the PTO issued Patent No. 6,423,339 on the application in July 2002 (the "'339 Patent"). (McElroy Decl. Ex. D.)

The court takes judicial notice of the patents' issuance and contents under Federal Rule of Evidence 201 because the patents are documents issued by the PTO, and are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." See In re Chippendales USA, Inc., 622 F.3d 1346, 1356 (Fed. Cir. 2010).

**D.     The Agreements**

St. John's was a party to four agreements with Bolton and Spireas (collectively, the "Agreements") which determined the rights and interests of the parties in intellectual property created using St. John's facilities and other resources.  These Agreements were: (1) the Patent Policy; (2) the Bolton Research Agreement; (3) the Spireas Fellowship Agreements; and (4) the Ciba-Geigy Agreement.

      1.     <u>The Patent Policy</u>

The St. John's College of Pharmacy and Allied Health Professions had a Patent Policy (the "Patent Policy") that governed "the ownership of inventions resulting from research conducted by St. John's faculty and students."  (<u>Id.</u> ¶ 13.)  The Patent Policy "was applicable to all faculty members, research/teaching fellows, graduate students, and doctoral students, at the St. John's College of Pharmacy and Allied Health Professions" from before 1984 to 1994.  (<u>Id.</u> ¶ 15.)  The Patent Policy applied to both Bolton and Spireas, both had notice of the Patent Policy, Spireas agreed to the Patent Policy as a condition of his enrollment as a graduate student, and both Bolton and Spireas agreed to it as a condition of their employment by St. John's.[5]  (<u>Id.</u> ¶¶ 16-19, 45, 71-74.)

Under the Patent Policy, Bolton and Spireas were contractually obligated to assign to St. John's

> all patentable inventions, discoveries, processes, uses, products, or combinations resulting, in whole or in part, from any of (a) the use of the laboratories or other facilities of [St. John's], (b) services rendered by faculty to [St. John's], (c) research conducted by graduate students or doctoral candidates under the direction of [St. John's] faculty, or (d) any related or predicate research . . . .

(<u>Id.</u> ¶¶ 14, 46, 51, 75.)

---

[5]    Spireas was employed by St. John's as a paid research/teaching fellow from September 1988 to May 1990. (<u>Id.</u> ¶ 21.)

## 2. The Bolton Research Agreement

In addition to the Patent Policy, Bolton signed an agreement with St. John's in June 1984 that governed the financial relationship between St. John's and Bolton regarding his research activities at St. John's (the "Bolton Research Agreement"). (Id. ¶ 47; Lundin Decl. (Docket Entry ## 36-1 and 36-2) Ex. 3.)[6] The Agreement restated Bolton's obligation under the Patent Policy to assign to St. John's all patentable inventions "resulting from research and research related services performed by Bolton at [St. John's]." (Compl. ¶¶ 47-48; Lundin Decl. Ex. 3.) However, the Agreement contained an additional clause in which the parties agreed that Bolton and St. John's would split the revenues "derived from the sale or licensing of such inventions, patent applications and patents . . . with (a) 30% for St. John's University and (b) 70% for Dr. Bolton and any student or other person whom Dr. Bolton determines has an interest herein." (Lundin Decl. Ex. 3.) The Bolton Research Agreement further obligated Bolton to "endeavor with reasonable diligence to secure the necessary patents and use his efforts to introduce such inventions, patent applications, and patents into public use and secure a reasonable revenue therefrom by issuing licenses thereunder or otherwise." (Lundin Decl. Ex. 3.)

## 3. The Spireas Fellowship Agreements

Spireas also executed an agreement with St. John's in April 1988, under which Spireas was granted a paid doctoral fellowship with St. John's in exchange for agreeing to assign to St. John's all patentable inventions resulting from his research. (Compl. ¶¶ 76-77.) Spireas signed a second such agreement in April 1989, which continued his doctoral fellowship (collectively the "Spireas Fellowship Agreements"). (Id.)

---

[6]     The Bolton Research Agreement is integral to the Complaint because Plaintiff relied on it in drafting the Complaint. (See Compl. ¶¶ 47-50.)

4. The Ciba-Geigy Agreement

In 1991, Bolton and Spireas facilitated an agreement between Ciba-Geigy and St. John's (the "Ciba-Geigy Agreement") that permitted Spireas to conduct some of his dissertation research using Ciba-Geigy's facilities while working under Bolton's supervision. (Id. ¶¶ 78-86.) At Bolton's and Spireas's request, Ciba-Geigy sent a letter to St. John's, including language that reiterated the terms of the Patent Policy. (Id.; McElroy Decl. Ex. E.) St. John's consented to the arrangement on the condition that Ciba-Geigy acknowledge and not interfere with St. John's rights to any fruits of the research under applicable St. John's policies and agreements. (Compl. ¶¶ 78-86.)

E. **Defendants' Allegedly Fraudulent Scheme**

To summarize, Plaintiff claims that it entrusted Bolton and Spireas with the resources they needed to make the scientific discoveries from which the Liquisolid Patents are derived. Moreover, St. John's support was expressly conditioned on Bolton's and Spireas's assent to this bargain: resources for intellectual property rights. But neither Bolton nor Spireas ever informed St. John's that their research had resulted in patentable inventions, the issuance of the Liquisolid Patents, or royalties derived from licensing the Liquisolid Patents. (Id. ¶¶ 115-54, 163-65.) In fact, shortly after Spireas graduated from St. John's, and shortly before Bolton and Spireas filed their first patent application, Bolton resigned from the University. (Id. ¶ 155.) Plaintiff alleges that Bolton left the University because he believed it would be easier to conceal the success of his research from St. John's if he was no longer an employee. (Id.) Plaintiff further alleges that Bolton's and Spireas's purpose in forming Hygrosol and assigning the Liquisolid Patents to it was to prevent Plaintiff from later asserting its contractual rights to the ownership of the

Liquisolid Patents and its share of the royalties derived from licensing them.  (Id. ¶¶ 157-62, 314-316.)

## II.     DISCUSSION

### A.     Legal Standard Applicable to the Motions to Dismiss

#### 1.     General Standard under Rule 12(b)(6)

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief.  Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007).  In reviewing the complaint, the court accepts as true all allegations of fact, and draws all reasonable inferences from these allegations in favor of the plaintiff.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  A complaint is legally sufficient to survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949. "[M]ere 'labels and conclusions' or 'formulaic recitation[s] of the elements of a cause of action will not do'; rather, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 555).

In deciding a motion to dismiss under Rule 12(b)(6), the court may, at its discretion, consider matters of which judicial notice may be taken, as well as documents extrinsic to the complaint where a plaintiff "relies heavily upon [the documents] terms and effect, [thus] render[ing] the document integral to the complaint."  Chambers v. Time Warner, Inc., 282 F.3d

147, 152-53 (2d Cir. 2002) (internal quotations omitted); <u>see also</u> <u>Republic of Colombia v.</u>

<u>Diageo N. Am. Inc.</u>, 531 F. Supp. 2d 365, 450-51 (E.D.N.Y. 2007).

      2.      <u>Standard for Assessing Statute of Limitations Defense under Rule 12(b)(6)</u>

Under New York law, the statute of limitations is an affirmative defense, and the

defendant bears the burden of proving that the plaintiff's claim is untimely.  <u>Bano v. Union</u>

<u>Carbide Corp.</u>, 361 F.3d 696, 710 (2d Cir. 2004).  "The defendant's normal burden includes

showing when the cause of action accrued."  <u>Id.</u>  Because the burden is on the defendants to

prove their affirmative defense, "[t]he pleading requirements in the Federal Rules of Civil

Procedure . . . do not compel a litigant to anticipate potential affirmative defenses, such as the

statute of limitations, and to affirmatively plead facts in avoidance of such defenses."  <u>Abbas v.</u>

<u>Dixon</u>, 480 F.3d 636, 640 (2d Cir. 2007).

Therefore, on a motion to dismiss under Rule 12(b)(6), a claim may be dismissed as time-

barred under the statute of limitations only if the factual allegations in the complaint clearly

show that the claim is untimely.  <u>Harris v. City of New York</u>, 186 F.3d 243, 250 (2d Cir. 1999);

<u>see also</u> <u>Davis v. Indiana State Police</u>, 541 F.3d 760, 763 (7th Cir. 2008) (concluding that the

Supreme Court's opinion in <u>Twombly</u> "did not revise the allocation of burdens concerning

affirmative defenses," and restating the rule that "complaints need not anticipate, and attempt to

plead around, potential affirmative defenses").  Dismissal is proper only when, drawing all

reasonable inferences in favor of the plaintiff, the court concludes that the plaintiff's own factual

allegations prove the defendant's statute of limitations defense.  For a defendant's statute of

limitations arguments to succeed, the plaintiff must "plead[] itself out of court."  <u>In re</u>

<u>marchFIRST Inc.</u>, 589 F.3d 901, 904-05 (7th Cir. 2009).

**B.     Plaintiff's Claims and the Motions to Dismiss**

Plaintiff's 61 page Complaint states 15 overlapping causes of action in its 318 numbered paragraphs.  Those causes of action can be grouped into nine categories:  (1) Bolton and Spireas violated their contractual obligations under the Agreements by failing to assign the Liquisolid Patents to the University; and, (2) in the case of Bolton, by failing to share with the University revenues he received from licensing the Liquisolid Patents (id. ¶¶ 198-250); (3) Bolton and Spireas tortiously breached their fiduciary duties to the University (id. ¶¶ 251-59, 268-75); (4) Bolton and Spireas fraudulently failed to disclose the value and patentability of their research at St. John's (id. ¶¶ 178-97); (5) Spireas aided and abetted Bolton's breaches of his fiduciary duty to St. John's (id. ¶¶ 260-67); (6) Spireas tortiously interfered with Bolton's contractual obligations to St. John's (id. ¶¶ 276-82); (7) Bolton's and Spireas's assignments of the Liquisolid Patents to Hygrosol were fraudulent conveyances intended to prevent St. John's from asserting its rights to the Liquisolid Patents under the Agreements (id. ¶¶ 312-18); (8) Defendants have been unjustly enriched at the expense of St. John's (id. ¶¶ 283-94); and (9) Defendants have converted property to which St. John's has superior rights of possession (id. ¶¶ 295-305). Plaintiff seeks equitable relief in the form of an order of specific performance for Defendants to assign the Liquisolid Patents to St. John's, and an order directing an equitable accounting of the Defendants' books and assets to determine the revenues obtained from the Liquisolid Patents. Plaintiff also seeks compensatory and punitive monetary damages.

In their two motions to dismiss, Defendants generally assert two types of defenses: (1) Plaintiff's allegations of fact are insufficient to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6) and, in some cases, Rule 9(b); and (2) Plaintiff's claims are untimely

under the relevant statutes of limitations. Plaintiff responds that its allegations of fact entitle it to equitable tolling of the statutes of limitations. (Opp. at 41-43.)

Jurisdiction in this case is premised on diversity of citizenship, and the parties all rely on New York law, the law of the forum state, in their submissions. See Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, at 121 n.5 (2d Cir. 1998). Furthermore, it appears from the Complaint that much of the conduct relevant to this action—*e.g.,* the execution of the Agreements at issue—occurred in New York. Thus, the court applies New York law to Plaintiff's claims and Defendants' defenses. Konikoff v. Prudential Ins. Co. of America, 234 F.3d 92, 98 (2d Cir. 2000).

## C. Breach of Contract

Plaintiff alleges that Bolton and Spireas breached two independent contractual obligations: (1) Bolton's and Spireas's obligation to assign the Liquisolid Patents to St. John's; and (2) their obligation to share the Liquisolid Patents' licensing royalties with St. John's. Under New York law, "[t]o make out a viable claim for breach of contract a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (quotation omitted). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent. . . . [A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002). The parties have submitted only one of the Agreements to the court, the Bolton Research Agreement. (See Lundin Decl. Ex. 3.) Plaintiff has also submitted a letter to St. John's from Ciba-Geigy which apparently memorializes the

Ciba-Geigy Agreement. (See McElroy Decl. Ex. E.) Therefore the court cannot interpret the Patent Policy, Ciba-Geigy Agreement, or Spireas Fellowship Agreements and must rely on Plaintiff's allegations of fact to determine whether Plaintiff has alleged Defendants breached those Agreements.[7]

## 1. Breach of the Assignment Obligations

Defendants argue that Plaintiff has failed to sufficiently allege that Bolton and Spireas breached an agreement to assign patentable inventions to St. John's. (See Spireas's and Hygrosol's Mem. ("Spireas Mem.") (Docket Entry # 41) at 5-7.) St. John's has pleaded the existence of Bolton's and Spireas's contractual duty to assign patentable inventions derived "in whole or in part" from research conducted at St. John's under the Patent Policy and the other Agreements. St. John's has also pleaded that it performed its obligations under the Agreements by employing Bolton and Spireas, enrolling Spireas as a graduate student, and giving both Bolton and Spireas the benefit of its resources. St. John's has further pleaded that the Liquisolid Patents are based on inventions derived "in whole or in part" from research performed at St. John's and subject to the Agreements, and that Bolton and Spireas have not assigned the Liquisolid Patents to St. John's. Finally, St. John's has pleaded that it has been damaged because it has not received the Liquisolid Patents and the accompanying royalty revenues from licensing the Liquisolid Patents. Under New York law, St. John's has sufficiently alleged that Bolton and Spireas breached their contractual obligations to assign patentable inventions to it.

Bolton argues that "the Complaint does not contain any plausible allegation that Dr. Bolton conducted research at [St. John's] relating to the patented invention; he did not."

---

[7] The court declines Spireas's and Hygrosol's invitation to order Plaintiff to amend its Complaint and attach copies of the Agreements. (Spireas's and Hygrosol's Reply Mem. ("Spireas Reply") (Docket Entry # 42) at 1 n.1.) As explained in this Memorandum and Order, Plaintiff's allegations of fact are sufficient for the purposes of the present motions to dismiss, and Plaintiff is not required to submit the Agreements to the court at this early stage of the litigation.

(Bolton's Reply Mem. ("Bolton Reply") (Docket Entry # 38) at 6; Bolton's Mem. ("Bolton Mem.") (Docket Entry # 36-3) at 17-18.)  This argument is without merit.  In its brief and in side-by-side comparisons of portions of the initial '834 Patent with sections of the dissertation (McElroy Decl. Ex. G), St. John's points out that significant material in the '834 Patent is literally copied from Spireas's dissertation (Opp. at 3-4).  Furthermore, Spireas was a graduate student working under Bolton's direction when Spireas conducted the research presented in the dissertation, and Bolton assisted Spireas in obtaining St. John's permission to do some of the research off campus at Ciba-Geigy with the express understanding that such off-campus work would not impair St. John's rights to the fruits of that research.

Spireas argues in the alternative, and for the first time in his Reply, that even if he was obligated to assign the '834 and '550 Patents, the '337 and '339 Patents are unrelated to them and the "contractual duty to assign or fiduciary duty to disclose . . . the invention claimed in the '834 and '550 patents . . . could not, as a matter of law, extend to the '337 and '339 Patents." (Spireas's and Hygrosol's Reply Mem. ("Spireas Reply") (Docket Entry # 42) at 8-9.)  Spireas contends that the '337 and '339 Patents, which are continuations-in-part ("CIPs") of the '834 and '550 Patents, are legally unrelated to the '834 and '550 Patents, simply because they include "additional subject matter *not present* in earlier filed patents."  (Spireas Reply at 9-10 (emphasis in original).)

Spireas's argument fails for two reasons.  First, St. John's has alleged that the '337 and '339 Patents were derived in whole or in part from research conducted at St. John's.  Spireas's argument that the '337 and '339 Patents are unrelated to the '834 and '550 Patents simply does not respond to this allegation.  Second, Spireas's claim that they CIPs are legally unrelated to the '834 and '550 Patents misstates the law.  While a CIP must include subject matter not contained

in the earlier patent, it must also contain subject matter contained in the earlier patent. By definition, a CIP "is an application filed during the lifetime of an earlier nonprovisional application, *repeating some substantial portion or all of the earlier nonprovisional application and adding matter not disclosed in the said earlier nonprovisional application.*" Manual of Patent Examining Procedure ("MPEP") § 201.08 (8th ed., Rev. 8, July 2010) (emphasis added). The relevant question for purposes of St. John's claims is whether the subject matter of the '337 and '339 Patents include research derived in whole or in part from research conducted at St. John's. If St. John's is entitled to assignment of the '834 and '550 patents because their subject matter discloses an invention that is the product, in whole or in part, of research conducted at St. John's, it is possible that the "substantial portion" of the '834 and '550 Patents contained in the '337 and '339 Patents is also derivative of research performed at St. John's. Drawing all reasonable inferences in favor of St. John's, the possibility that the '337 and '339 Patents are unrelated to the '834 and '550 Patents is plainly insufficient for the court to conclude on a motion to dismiss that the '337 and '339 Patents are not derived from research conducted at St. John's.[8]

Bolton also argues that because he was not listed as an inventor of the '339 Patent St. John's has no breach of contract or fiduciary duty claim against him for his actions in relation to that patent.[9] (Bolton Mem. at 1.) St. John's alleged contract rights relate to patentable inventions or discoveries derived in whole or in part from research conducted at St. John's—not just patents. Therefore, it is irrelevant whether Bolton was listed as an inventor on the face of the

---

[8]    Bolton further argues, however, that the '339 Patent is not substantially related to the others because only the specifications section of the patent is similar to the other Liquisolid Patents, while the claims section "is completely different from the research and conclusions contained in Spireas' dissertation." (Bolton Reply at 6 n.4.) Whether the '339 Patent is sufficiently dissimilar from the research disclosed in Spireas's dissertation to warrant a determination that it does not derive "in whole or in part" from research conducted at St. John's is a mixed question of law and fact the court cannot resolve on a motion to dismiss. See infra Part II.C.3.

[9]    Plaintiff alleges that Bolton was listed as an inventor on the patent application that resulted in the '339 Patent (Compl. ¶ 32), but Bolton was not listed as an inventor of the resulting '339 Patent (McElroy Decl. Ex. D).

'339 Patent. <u>HIF Bio, Inc. v. Yung Shin Pharmaceuticals Indus. Co., Ltd.</u>, 600 F.3d 1347, 1354-57 (Fed. Cir. 2010) (determination of inventorship not essential to resolution of state law claims for conversion, tortious interference with contract, fraud, unjust enrichment, or breach of implied contract where plaintiff alleges non-patent facts entitling it to relief).

    2. <u>Breach of the Revenue-Sharing Obligation</u>

   Defendants also argue that Plaintiff has failed to sufficiently allege that Bolton and Spireas breached an agreement to share licensing royalties with St. John's. The terms of the Bolton Research Agreement impose express contractual duties on St. John's and Bolton to share the revenues derived from the sale or licensing of inventions or patents resulting in whole or in part from his research related services at St. John's. (Lundin Decl. Ex. 3.) St. John's has pleaded that it performed its obligations under the Bolton Research Agreement by employing Bolton and giving Bolton the benefit of its resources. St. John's has further pleaded: that the Liquisolid Patents are based on inventions derived in whole or in part from Bolton's research related services at St. John's; that Bolton has obtained royalties from licensing the Liquisolid Patents; and that Bolton has not shared any of those licensing revenues with St. John's. Finally, St. John's has pleaded that it has been damaged because it has not received its share of royalty revenues. Under New York law, St. John's has sufficiently alleged that Bolton breached his contractual obligation under the Bolton Research Agreement to share patent-licensing royalties with it.

   Bolton argues that St. John's rights to revenue sharing can only be derivative of St. John's right to assignment of the Liquisolid Patents, and are thus dependent on St. John's ability to establish its claims for breach of the patent-assignment obligation. (Bolton Mem. at 8-9.) Similarly, Bolton argues that the revenue-sharing provision of the Bolton Research Agreement

must be read in conjunction with the assignment provision as a residual protection of *only* Bolton's interest in the royalty revenues. (Bolton Reply at 1-3.) Bolton contends that because St. John's was entitled to full ownership of the patent, including the right to all licensing royalties, the parties contemplated only that St. John's would share revenues with Bolton, not that Bolton would share royalties with St. John's. (Id.)

The revenue-sharing term in the Bolton Research Agreement was a separate contractual duty that applied independent of Bolton's performance of the assignment obligation. Because the court interprets the assignment obligation under the Agreements to impose a duty of future performance on Bolton and Spireas, rather than effect an automatic assignment, (see infra Part II.C.4.a), it is reasonable to infer that St. John's and Bolton anticipated there might be a gap between the issuance of a patent to Bolton and the subsequent assignment of the patent to St. John's. Drawing all reasonable inferences in favor of Plaintiff, the court interprets the revenue-sharing provision to protect both St. John's and Bolton's interests in receiving the stated revenues—St. John's share prior to assignment, and Bolton's share following assignment. Indeed, the revenue-sharing term does not specifically state which party is obligated to make the royalty payments, it states: "It is further understood and agreed that a percentage of the revenue derived from the sale or licensing of such inventions, patent application and patents, shall be shared with (a) 30% for St. John's University and (b) 70% for Dr. Bolton, and any student or other person whom Dr. Bolton determines has an interest herein, their heirs, assigns and personal representatives." (Lundin Decl. Ex. 3.) Bolton's obligation to share licensing royalties with St. John's is not dependent on St. John's right to have Bolton assign the Liquisolid Patents to it.

While the Bolton Research Agreement clearly obligates Bolton to share royalty payments with St. John's, Plaintiff has not pleaded the existence of a similar contract term independently

obligating Spireas to share royalty revenues with St. John's. Furthermore, St. John's does not allege facts sufficient to infer that Spireas had an independent contractual duty under the Patent Policy, Spireas Fellowship Agreements, or Ciba-Geigy Agreement to share royalty revenues with St. John's. To the extent Spireas is under an obligation to share royalties with St. John's, that obligation is derivative of St. John's right to assignment of Spireas's interest in the Liquisolid Patents.

        3.     <u>Public Policy Arguments Against Enforceability</u>

Defendants argue, in the alternative, that Plaintiff's interpretation of the language in the Agreements giving Plaintiff rights to all inventions resulting "in whole or in part" from research conducted at St. John's is so broad as to constitute an open-ended assignment of all an inventor's future inventions, and are unenforceable under public policy principles prohibiting a "mortgage on a man's brain." (Spireas Mem. at 7.) This argument is without merit. As explained in case law setting forth this ancient doctrine, a patent assignment agreement is an unenforceable "mortgage on a man's brain" when it is "[a] naked assignment or agreement to assign, in gross, a man's future labors as an author or inventor," including those as yet unknown. <u>Aspinwall Manufacturing Co. v. Gill</u>, 32 F. 697, 700-701 (Bradley, Circuit Justice, C.C.D.N.J. 1887). As alleged in the Complaint, the Liquisolid Patents reflect inventions resulting in whole or in part from research performed by the Defendants *at St. John's*. Federal courts have consistently upheld the validity of patent-assignment obligations imposed on university students, faculty, and staff as a condition of their research activities at the university. <u>See, e.g.</u>, <u>Regents of the Univ. of New Mexico v. Knight</u>, 321 F.3d 1111, 1117-20 (Fed. Cir. 2003); <u>Univ. of West Virginia Bd. of Trustees v. VanVoorhies</u>, 278 F.3d 1288, 1297-98 (Fed Cir 2002); <u>Chou v. Univ. of Chicago</u>, 254 F.3d 1347, 1356-57 (Fed. Cir. 2001). These patent-assignment provisions do not implicate

all of a researcher's future inventions "in gross"; instead, like the Agreements at issue in this case, they apply to inventions derived from research performed while the researcher is at the university.

While it may be that the "in whole or in part" language in St. John's assignment provision is susceptible of potentially impermissible interpretations that would allow St. John's to assert ownership over inventions not substantially related to research performed at St. John's, see, e.g., American Cone and Wafer Co. v. Consolidated Wafer Co., 247 F. 335, 336-37 (2d Cir. 1917) (holding patent-in-suit was too dissimilar from patent subject to earlier assignment to be an improvement subject to that assignment), drawing all inferences in favor of the Plaintiff the court cannot conclude that Plaintiff's contractual rights to assignment and revenue sharing are unenforceable as a matter of public policy. At present it is sufficient that Plaintiff has alleged a breach of the assignment and revenue-sharing provisions, and that the court can reasonably infer from the factual allegations of breach that Plaintiff has stated a claim that is not prohibited by public policy.

Advancing a somewhat similar argument, Spireas contends that courts have narrowly interpreted patent policies to apply only to patent applications filed while the researcher was employed or enrolled at the university. (Spireas Mem. at 5-6; Bolton Mem. at 13 n.7.) Here, the applications for the Liquisolid Patents were not filed until after Bolton and Spireas left St. John's. Spireas cites Fenn v. Yale University, 283 F. Supp. 2d 615, 621, 626-27 (D. Conn. 2003), Knight, 321 F.3d at 1114 (Fed. Cir. 2003), and E.I. Du Pont de Nemours & Co. v. Okuley, 344 F.3d 578, 585 n.5 (6th Cir. 2003), in support of this argument. These cases, however, do not stand for this proposition, and there is no evidence that other courts have narrowed patent policies in the way he suggests. The fact that the researchers against whom the

courts rendered judgment in <u>Fenn</u>, <u>Knight</u>, and <u>Du Pont</u>, were university employees at the time the patent applications were filed does not mean that their employment was a necessary condition of those courts' holdings. Indeed in <u>Du Pont</u>, 344 F.3d at 585 n.5, the Sixth Circuit reasoned that the researcher's employment status at the time his performance came due under the patent policy was irrelevant to the existence of his duty of performance, stating: "[Defendant's] contractual obligation to give [the patent] to [Plaintiff], incurred during the lifetime of the contract, survived until fulfilled." Bolton and Spireas likewise incurred their obligations to assign patentable inventions to St. John's by performing the research from which those inventions derived at St. John's and while subject to the Agreements.

Furthermore, the court perceives no reason why it should be the first to endorse Spireas's public policy argument. Spireas's argument, that patent policies are only enforceable with respect to patents applied for during a researcher's affiliation with the university, would create undesirable incentives for those engaged in productive research to abruptly end their work and leave the university at the first hint that they had made a profitable discovery—or worse, to conceal and hoard scientific discoveries for later exploitation. The court perceives no public policy concern with permitting a university to enforce its rights to intellectual property when, as is the case here, those intellectual property rights are implicated by patent applications filed by its former employees or students after they leave the university.

4.    Statute of Limitations Defenses to Contract Claims

Defendants' most serious challenge to the two categories of contract claims is that they are time-barred under the relevant New York statutes of limitations. In New York, an action to enforce a contractual obligation is subject to a six-year limitations period. N.Y. C.P.L.R. § 213(2). "Under New York law, a cause of action for breach of contract accrues and the statute

of limitations commences when the contract is breached." <u>T & N PLC v. Fred S. James & Co. of</u>
<u>New York, Inc.</u>, 29 F.3d 57, 59 (2d Cir. 1994); <u>Ely-Cruikshank Co., Inc. v. Bank of Montreal</u>, 81
N.Y.2d 399, 402 (1993); N.Y. C.P.L.R. § 203(a). To establish that the statute of limitations bars
Plaintiff's claims on a motion to dismiss, Defendants must establish that Plaintiff's own
allegations of fact clearly establish that its claims are untimely. <u>See</u> <u>supra</u> Part II.A.2.
Accordingly, the court looks to the latest accrual dates of the breach of contract claims
reasonably suggested by the facts alleged in the Complaint. For reasons explained below, the
court finds that Plaintiff's patent-assignment claims are untimely, and at least some of Plaintiff's
revenue-sharing claims are timely.

a.    <u>Accrual of Claim for Breach of the Assignment Obligations</u>

St. John's repeatedly alleges that Bolton and Spireas had "agreed" or were "obligated" or
"required" to assign the Liquisolid Patents, implying that the Agreements contemplated future
performance by Bolton and Spireas in assigning their inventions to the University. In <u>Board of</u>
<u>Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.</u>, 583 F.3d
832, 841 (Fed. Cir. 2009) ("<u>Stanford</u>"), <u>cert. granted</u>, 79 U.S.L.W. 3268 (U.S. Nov. 1, 2010) (No.
09-1159), 2010 WL 1180644, the Federal Circuit noted that it has ordinarily interpreted the
language "agree to assign" in university patent policies as a "promise to assign rights in the
future, not an immediate transfer of expectant interests." A promise to assign may vest the
promisee with equitable rights against the promisor, but does not effect a present transfer of
interests. <u>Id.</u> at 841-42. Because the Complaint does not allege that the Agreements effected an
automatic assignment of the Liquisolid Patents, the interpretation of the Agreements—including
the determination of the time when performance is due—is controlled by state law. <u>Id.</u> at 841
("The question of who owns the patent rights and on what terms typically is a question

exclusively for state courts.") (internal quotation omitted). Because the assignment obligation imposed a duty of future performance on Bolton and Spireas, the Complaint alleges that Bolton and Spireas breached their assignment obligations in at least two ways: (1) by rendering themselves incapable of assigning the Liquisolid Patents to St. John's; and (2) by failing to assign the Liquisolid Patents within a reasonable time following patent issuance.

The first act alleged in the Complaint which clearly breached Bolton's and Spireas's assignment obligation was their assignment of the Liquisolid Patents to Hygrosol. The assignment of a patent divests the assignor of any ownership stake in the patent and leaves him with nothing more to assign, thus negating any future assignment to a third party. Stanford, 583 F.3d at 842 (quoting FilmTec Corp. v. Allied-Signal, Inc., 939 F.2d 1568, 1572-73 (Fed. Cir. 1991)). Upon assigning the Liquisolid Patents to Hygrosol, Bolton and Spireas rendered themselves incapable of performing their obligations to assign the Liquisolid Patents to St. John's and breached the Agreements. But the court cannot determine from the face of the Complaint that the Hygrosol assignments occurred outside the limitations period. Defendants breached their obligation to assign the Liquisolid Patents to St. John's by at least October 12, 2006,[10] the date on which they recorded the assignments to Hygrosol with the PTO, and presumably the latest date the assignments could have occurred. However, Plaintiff has not averred that the Hygrosol assignments occurred on an earlier date, and because Defendants bear

---

[10] The court takes judicial notice of the fact that the Liquisolid Patents were assigned to Hygrosol no later than October 12, 2006, the date on which Hygrosol recorded the assignments with the PTO under 35 U.S.C. § 261. See USPTO Assignments on the Web, Patent Assignee Summary, http://assignments.uspto.gov/ assignments/?db=pat (insert "Hygrosol" into search field "Assignee name" and click "Search" button).

When Hygrosol recorded the assignments, Hygrosol represented to the PTO that Bolton and Spireas executed *all four* assignments on June 1, 1998, before Bolton and Spireas had even filed some of the patent applications that resulted in the Liquisolid Patents. See USPTO Assignments on the Web, Patent Assignee Summary, http://assignments.uspto.gov/assignments/?db=pat (insert "Hygrosol" into search field "Assignee name" and click "Search" button; click hyperlink of patent number under "PAT#"; find the patent assignment execution date under "Exec Dt"). Whether the assignments actually occurred on that date or at some other time is a mixed question of law and fact the court cannot resolve on a motion to dismiss, and without any of the relevant facts.

the burden of establishing their statute of limitations defense, the court cannot assume that those assignments occurred more than six years prior to the filing of this action. Therefore, the court must determine whether Defendants breached their duties to assign the Liquisolid Patents on an earlier date.

The Complaint does not allege on what dates Bolton and Spireas owed St. John's duties of performance under the Agreements, such that their failure to assign the Liquisolid Patents on those dates would constitute a breach of their promises to assign; but it does allege a breach of those Agreements. As the Federal Circuit noted in <u>Stanford</u>, a researcher's agreement to assign his future interests in a patent may not necessarily specify the time for the researcher's performance. The patent agreement at issue in that case provided that the researcher "agreed only to assign his invention rights to Stanford at an undetermined time." <u>Stanford</u>, 583 F.3d at 841. Because the Complaint does not specifically allege when Defendants' performance was due, the court infers that the Agreements were silent on that term.

Under New York law "[e]ven though a contract fixes no time for performance, if not void for uncertainty, an agreement is implied that the act shall be done within a reasonable time." <u>City of New York v. New York Cent. R.R. Co.</u>, 275 N.Y. 287, 292-93 (1937). "What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case." <u>Savasta v. 470 Newport Assocs.</u>, 82 N.Y.2d 763, 765 (1993).

It is clear that obtaining patent protection for subject inventions was the event of greatest importance to the parties, and the focus of the Agreements. The Agreements contemplated that Bolton and Spireas would engage in research over an extended period of time, and could conceivably make several discoveries yielding patentable inventions. The determination how to define a particular invention, and whether it was a "patentable invention" subject to the

Agreements, would not necessarily become clear until the parties decided to seek patent protection for it. Thus, while St. John's might have demanded assignment of subject inventions at some point before a patent issued, see FilmTec, 939 F.2d 1568, 1572 (Fed. Cir. 1991), the precise nature of the "patentable" inventions to which it was entitled would not necessarily become clear until the PTO issued a patent, which defines the invention by its claims. See General Elec. Co. v. Wabash Appliance Corp., 304 U.S. 364, 369 (1938) ("The claims measure the invention."). Indeed, the sale or exploitation of patents was clearly a focus of the Agreements, and St. John's would not have obtained the commercial benefit of the patent monopoly until a patent issued. (See, e.g., Lundin Decl. Ex. 3 (requiring Bolton to use his efforts to obtain reasonable revenue from patents)). Under the circumstances, the latest event triggering Bolton's and Spireas's duties of performance that can reasonably be inferred from the Complaint was the issuance of a patent by the PTO that disclosed an invention subject to the Agreements. Therefore, Bolton and Spireas were obligated to perform their assignment duties within a reasonable time following the issuance of each of the Liquisolid Patents, and they breached the Agreements when they failed to do so.

Under New York law "knowledge of the occurrence of the wrong on the part of the plaintiff is not necessary to start the Statute of Limitations running in a contract action." Ely-Cruikshank Co., Inc. v. Bank of Montreal, 81 N.Y.2d 399, 403 (1993) (quotation omitted). Consequently, though St. John's was ignorant of the existence of the Liquisolid Patents, the limitations period for its breach of contract claims began to run on the dates the Liquisolid Patents issued. Because more than six years elapsed between those dates (see Compl. ¶¶ 33-36) and Plaintiff's filing of this action in New York Supreme Court,[11] these claims are untimely

---

[11] St. John's sued the Defendants on November 18, 2008, by filing a Notice and Summons in New York Supreme Court, Queens County. Spireas removed the action to this court on December 15, 2008. (Notice of

under the statute of limitations absent Plaintiff's ability to establish that it is entitled to equitable tolling of the statute of limitations.  See infra Part II.I.2.

> b.  Accrual of Claim for Breach of the Revenue-Sharing Obligations

Bolton's obligation to share licensing revenues with St. John's, as alleged, constitutes a contract requiring continuing performance over a period of time, with each successive breach subject to its own limitations period.  See Guilbert v. Gardner, 480 F.3d 140, 150 (2d Cir. 2007). Bolton's duty to share royalties with St. John's arose when he received royalty payments made by the licensee.  Therefore, Plaintiff's claims that Bolton breached the Bolton Research Agreement's revenue-sharing provision are timely insofar as they are relate to royalties received by Bolton within six years of the commencement of this action.  The revenue-sharing claims as to revenues received before that time period are barred by the statute of limitations absent Plaintiff's ability to establish that it is entitled to equitable tolling of the statute of limitations. See infra Part II.I.2.

## D.  Fiduciary Duty

### 1.  Allegation of a Fiduciary Relationship

Plaintiff alleges that Bolton and Spireas owed it a fiduciary duty to disclose the patentability of the inventions produced in whole or in part from their research at St. John's. Bolton and Spireas challenge the sufficiency of Plaintiff's allegation that Bolton and Spireas were fiduciaries of the University.  (Bolton Mem. at 11-13; Spireas Mem. at 12-14.)  They further argue that, as a matter of law, neither a professor nor a student can be a fiduciary of a university.  (Spireas Mem. at 13-14; Bolton Mem. at 12.)  Finally, Bolton and Spireas argue that even if they had duties to disclose, they complied with those duties.  (Spireas Mem. at 7-8;

---

Removal (Docket Entry # 1).)  Plaintiff subsequently filed this Complaint on March 4, 2009.  (See Compl.)  For purposes of the statutes of limitations, the action was commenced and the statutes of limitations ceased to run on November 18, 2008.

Bolton Mem. at 7 n.5.)

In New York, the existence of a fiduciary relationship is determined on a case-by-case basis. "A fiduciary relation exists between two persons when one of them is under a duty to act or to give advice for the benefit of the other upon matters within the scope of the relation." Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 168 (1st Dep't 1987). In Brass v. American Film Technologies, Inc., 987 F.2d 142, 150-51 (2d Cir. 1993), the Second Circuit observed that under New York law, "a fiduciary relationship embraces not only those the law has long adopted—such as trustee and beneficiary—but also more informal relationships where it can be readily seen that one party reasonably trusted another." Consequently, determining the existence of a fiduciary relationship requires a fact-specific inquiry implicating all the circumstances and conduct relevant to understanding the parties' relationship. See Lumbermens Mutual Casualty Co. v. Franey Muha Alliant Ins. Servs., 388 F. Supp. 2d 292, 305 (S.D.N.Y. 2005); Wiener v. Lazard Frères & Co., 241 A.D.2d 114, 122 (1st Dep't 1998). This inquiry assesses whether the particular relationship has the "[f]our elements that are essential to the establishment of a fiduciary relationship: (1) the vulnerability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself." Atlantis Information Technology, GmbH v. CA, Inc., 485 F. Supp. 2d 224, 231-32 (E.D.N.Y. 2007) (quotation omitted).

In beginning this relationship-specific inquiry, New York courts look first to whether there is a contractual relationship between the parties. "[W]here parties have entered into a contract, courts look to that agreement 'to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency.'" EBC I, Inc.

v. Goldman Sachs & Co., 5 N.Y.3d 11, 19-20 (2005) (quoting Northeast General Corp. v. Wellington Advertising, Inc., 82 N.Y.2d 158, 160, 162 (1993) ("Before courts can infer and superimpose a duty of the finest loyalty, the contract and relationship of the parties must be plumbed.")). Some courts have found that a sufficiently comprehensive contract between the parties will defeat a finding that the parties were in a fiduciary relationship. See Wiener, 241 A.D.2d at 122. But the existence of a contract between the parties defining the broad contours of their relationship does not preclude a finding of a fiduciary relationship. To the contrary, a contract may create a fiduciary relationship: "'If a contract establishes a relationship of trust and confidence between the parties . . . then a fiduciary duty arises from the contract which is independent of the contractual obligation.'" Lumbermens, 388 F. Supp. 2d at 305 (S.D.N.Y. 2005) (quoting GLM Corp. v. Klein, 665 F. Supp. 283, 286 (S.D.N.Y. 1987)); see also Bank of America Corp. v. Lemgruber, 385 F. Supp. 2d 200, 224 (S.D.N.Y. 2005). "It is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself." Mandelblatt, 132 A.D.2d at 167-68 (citations omitted).

But the court's inquiry does not end with an examination of the parties' written agreements. "[I]t is not mandatory that a fiduciary relationship be formalized in writing, and any inquiry into whether such obligation exists is necessarily fact-specific to the particular case. Beyond what may be memorialized in writing, a court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." Wiener, 241 A.D.2d at 122; accord Sergeants Benevolent Ass'n Annuity Fund v. Renck, 19 A.D.3d 107, 110 (1st Dep't 2005). In Wiener, the court observed that even in those cases in which the agreements were sufficiently detailed for the court to infer that the parties did not

intend to create a fiduciary relationship, the courts still "carefully considered the ongoing conduct between the parties outside of the written contract. . . ." 241 A.D.2d at 122 (citing Northeast General Corp. v. Wellington Advertising, Inc., 82 N.Y.2d 158, 162-65 (1993)).

The terms of the parties' written Agreements, as alleged by Plaintiff, provide the court's starting point. Plaintiff has alleged that the Agreements implicitly created a relationship of trust and confidence between St. John's and Bolton and Spireas by making St. John's dependent on the two to assess the value of their research and notify St. John's if their work produced a patentable invention. The Agreements did not constrain Bolton and Spireas to work on particular research projects or meet time tables for obtaining results, but left Bolton and Spireas to conduct their research as they saw fit. The Agreements required only that the two exercise their discretion in determining whether any inventions resulting from their research were patentable. The documents submitted by the parties, the Bolton Research Agreement and the letter memorializing the Ciba-Geigy Agreement, clearly demonstrate that St. John's reposed trust and confidence in Bolton and Spireas through the Agreements. In obtaining St. John's assent to the Ciba-Geigy Agreement, Bolton and Spireas explicitly requested permission for Spireas to conduct at least some of the research off-campus under Bolton's direction, and at a location where it would be difficult, if not impossible, for St. John's to independently obtain information about the progress of the research from sources other than Bolton or Spireas. St. John's assent to that request for special permission clearly demonstrates that it trusted Bolton and Spireas to fulfill their responsibilities under the Agreements insofar as St. John's relinquished what little ability it already had to independently check on the progress of the research. In the Bolton Research Agreement, Bolton obligated himself to use "reasonable diligence" to secure patents on "[a]ll patentable inventions" resulting in whole or in part from his research at St. John's, and to

"use his efforts" to "secure a reasonable revenue therefrom."  (Lundin Decl. Ex. 3.)  By its terms the Agreement specifically called for Bolton to exercise his discretion in determining whether the inventions were patentable, whether to patent his inventions, and how to obtain revenue from the inventions.  The Agreements recognized that Bolton and Spireas were in the best position to assess the value of their work, and effectively left St. John's dependent on Bolton and Spireas to conduct their research and determine the value of their inventions in a manner that would serve St. John's interests.

The parties' course of conduct and the nature of their relationship compel the same conclusion.  In a case presenting similar issues, Fenn, 283 F. Supp. 2d 615, the court was required to assess the conduct of the parties to determine whether the university in that case had reposed trust or confidence in one of its professors with respect to the university's financial interests in the professor's research.  Although the court in that case applied Connecticut fiduciary duty law, the inquiry pursued by the Fenn court is functionally identical to that required by New York law, and the court finds the Fenn court's analysis of the relationship between university and researcher persuasive.  Id. at 631-32.  In Fenn the court reasoned that the plaintiff in that case, Dr. Fenn, was no mere employee of the university, but was entrusted with the management of considerable resources in support of his research activities *because of* his superior knowledge, skill, and expertise in his field.  Id. at 632.  Thus, the court concluded that Dr. Fenn owed fiduciary duties of loyalty and candor to the university in relation to his research. Id.

The same is true here.  Bolton and Spireas were entrusted with St. John's resources and the autonomy and discretion to use those resources, because they possessed the special knowledge and expertise required to exploit those resources through useful research that might

result in patentable discoveries.  St. John's further entrusted Bolton with the responsibility of overseeing Spireas's research as his dissertation research advisor, and it is reasonable to infer from the Complaint that Spireas was accountable largely to Bolton alone.  It is also true, however, that the same special knowledge and expertise that made it worthwhile for St. John's to support Bolton and Spireas's research also left St. John's dependent on them to determine whether their research had succeeded in producing a patentable invention.  To paraphrase <u>Fenn</u>: Bolton and Spireas knew more about the value and patentability of inventions they developed than anyone else, and St. John's necessarily and reasonably relied on their expertise in evaluating such inventions.  <u>See id.</u>  Indeed, it is difficult to imagine how St. John's would have been able to independently determine the patentability and value of Bolton's and Spireas's research without their affirmative disclosure of material information relating to it.

On the facts alleged, St. John's was vulnerable to Bolton's and Spireas's abuse of their positions of trust which they willingly solicited and accepted, Bolton and Spireas were empowered by this relative superiority in relation to their research, and St. John's was prevented from effectively protecting its interests because of Defendants' empowerment.  <u>See</u> <u>Atlantis Information Technology</u>, 485 F. Supp. 2d at 231-32.  Under these circumstances Bolton and Spireas were fiduciaries of St. John's, and owed it a duty to fully disclose material facts relating to their research.  <u>Brass</u>, 987 F.2d at 150 (2d Cir. 1993) ("New York recognizes a duty by a party to a business transaction to speak . . . when the parties stand in a fiduciary or confidential relationship with each other . . . .") (quotation and citations omitted); <u>see also</u> <u>Harding v. Naseman</u>, No. 07 Cv. 8767(RPP), 2009 WL 1953041, at *23 n.39 (S.D.N.Y. July 8, 2009).

2.      <u>Relationship Between Students or Professors and Universities</u>

Defendants contend that as a matter of law, neither employees nor students can be

fiduciaries of a university. (Spireas Mem. at 13-14; Bolton Mem. at 12.)  There is no such rule.

Spireas cites Moy v. Adelphi Institute, 866 F. Supp. 696, 708 (E.D.N.Y. 1994), which stands merely for the proposition that a typical student-university relationship does not, *without more*, establish a fiduciary relationship between student and university.  Moreover, Moy is distinguishable on its facts.  In Moy the court found that the student plaintiffs failed to allege that a private vocational school *owed them* fiduciary duties, finding only a conventional business relationship.  Id.  The students did not allege facts differentiating their relationship with the school from the relationship that any student who enrolls and pays tuition has with his university. Id. at 699-701.  Similarly, both Defendants cite Maas v. Cornell University, 245 A.D.2d 728, 731 (3d Dep't 1997), which holds that a professor's employment at his university does not, on its own, create a fiduciary relationship with the university.  In Maas a professor disciplined for sexual harassment apparently argued that the university breached a fiduciary duty *it owed to him* by failing to keep the resolution of the sexual harassment complaint confidential, but did not allege facts demonstrating that his relationship with the university was any different than that between an employee and his employer.  Moy and Maas are inapposite because Plaintiff has alleged more than an ordinary relationship between student and university or professor and university.  Spireas was not just a student attending classes and turning in assignments, and Bolton was not just a professor lecturing in class and holding office hours; the two were conducting valuable research in fulfillment of requirements imposed by St. John's, in which St. John's had a real and substantial financial interest.

Spireas also relies on University of Pittsburgh v. Townsend, 542 F.3d 513, 526-27 (6th Cir. 2008).  In University of Pittsburgh the court reasoned that a professor was necessarily subordinate to the university because he was the employee of a large institution, and found that if

the disparity in power ran in any direction, it ran in favor of the university.  Id.  Accordingly, the

Sixth Circuit found the professor owed no duty of disclosure to the university.  Id.  Directing the

court's attention to Atlantis Information Technology, 485 F. Supp. 2d at 231-32 (finding

allegation of fiduciary duty insufficient where parties were commercial entities negotiating at

arms-length in a conventional business relationship), Spireas argues that for much the same

reasons, a university cannot be vulnerable to "an ordinary graduate student conducting research

off campus."  (Spireas Mem. at 14.)  Insofar as Townsend's finding relied on a formalist

conception of the employment relationship without reference to the factual circumstances

underlying the relationship between the particular professor and university, its holding is

inconsistent with New York law, and is not persuasive to this court's analysis of the particular

facts alleged in the Complaint.

3.      Limitations Period Applicable to Fiduciary Breach

Ordinarily, a tort claim for a breach of fiduciary duty accrues on the date the fiduciary

breaches his duty,  Kaufman v. Cohen, 307 A.D.2d 113, 121 n.3 (1st Dep't 2003), and is time-

barred under the statute of limitations if not brought within six years.  N.Y. C.P.L.R. § 213(1).

The limitations period applicable to a claim for breach of fiduciary duty, however, is tolled

during the duration of the fiduciary relationship, and does not begin to run "until the fiduciary

has openly repudiated his or her obligation or the relationship has been otherwise terminated."

Golden Pacific Bancorp v. FDIC, 273 F.3d 509, 518 (2d Cir. 2001).

The parties dispute the date on which any fiduciary relationship might have been

terminated.[12]  Bolton and Spireas argue that their separation from the University ended any

---

[12]     Bolton and Spireas also argue that they openly repudiated any fiduciary obligation they may have had when
they filed applications for the Liquisolid Patents.  This argument merely restates the argument advanced by
Defendants that issuance of the Liquisolid Patents gave constructive notice of Bolton's and Spireas's breach to
Plaintiff, and the court rejects this argument for the same reasons. See infra Part II.I.3.

fiduciary relationship they might have had with St. John's, and commenced the running of the statute of limitations. (Spireas Reply at 2; Bolton Mem. 12-13.) St. John's contends that even after Bolton and Spireas left the University, their fiduciary duties to St. John's, with respect to the research they had conducted there, continued. (Opp. at 24-25.)

Bolton and Spireas ask this court to treat this case like any other in which an employee, who is also a fiduciary of his employer, leaves his job and thereby terminates the fiduciary relationship. However, this case is not analogous to those, cited by Bolton and Spireas, in which an employee, typically an officer or director of a corporation, leaves his position and competes with his former employer. See, e.g., Manley v. AmBase Corp., 126 F. Supp. 2d 743, 756-57 (S.D.N.Y. 2001) (collecting cases). In cases such as Keehan v. Keehan, No. 96 Civ. 2481, 2000 WL 502854, at *4 (S.D.N.Y. April 25, 2000), cited by St. John's and Bolton, the corporate officer's or director's fiduciary duty arises from the fact of his employment by the corporation and the power he exercises over its affairs. The policy concern underlying the fiduciary duty of loyalty in those cases is that the officer or director will misuse the powers of his position for his personal benefit. That concern ceases, in large part, when the corporate fiduciary leaves his position. But in situations where a corporate fiduciary has the ability to use trade secrets or other confidential information he obtained during his employment to compete against his employer, it is well-established that even a former employee's duties to the corporation continue with respect to that information. See ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 994 (2d Cir. 1983). Thus, the termination of a formal relationship such as employment is relevant, but it is not always the sole criterion for determining the duration of a fiduciary relationship.

In this case, the fiduciary duties alleged by St. John's arose not merely from Defendants' employment or enrollment at St. John's, but principally from their direction of a research venture

in which St. John's had a continuing financial interest.  The closer analogy is to the duties of

fiduciaries with respect to "corporate opportunities" in which their principal has a "tangible

expectancy."  See Alexander & Alexander of New York, Inc. v. Fritzen, 147 A.D.2d 241, 247-48

(1st Dep't 1989).  "The corporate opportunity doctrine prohibits a corporate employee from

utilizing information obtained in a fiduciary capacity to appropriate a business opportunity

belonging to the corporation."  American Fed. Group, Ltd. v. Rothenberg, 136 F.3d 897, 905 (2d

Cir. 1998); Burg v. Horn, 380 F.2d 897, 899 (2d Cir. 1967) (corporate opportunity doctrine

applies to "prevent [a corporate fiduciary's] acquisition of property . . . which they are otherwise

under a duty to the corporation to acquire for it").  The doctrine focuses on the corporation's

"tangible expectancy" in the opportunity instead of on the former employee's status with the

corporation when he diverts the opportunity to his own benefit.  Thus, the doctrine applies to

opportunities an employee learns about during the course of his employment even after the

employment relationship is terminated.  Abbott Redmont Thinlite Corp. v. Redmont, 475 F.2d

85, 88 (2d Cir. 1973) (citing Meinhard v. Salmon, 249 N.Y. 458, 464 (1928)).

     While Bolton and Spireas were not literally working under a duty to acquire patentable

inventions for St. John's, St. John's did have a tangible expectancy, under the Agreements, in

any patentable inventions that resulted from their research.  It is irrelevant that Bolton and

Spireas were no longer affiliated with St. John's when they patented the inventions because their

duties in relation to the inventions arose when they conducted the research on which the

inventions were based while they were at St. John's.

     Plaintiff has alleged facts sufficient to establish that the fiduciary relationship alleged in

the Complaint did not terminate when Bolton and Spireas left the University, and existed until

Bolton and Spireas openly repudiated St. John's demands for performance of the Agreements in

November 2008.  (Compl. ¶¶ 300-301.)  Therefore, Plaintiff's claim for breach of fiduciary duty falls well within the six-year limitations period ordinarily applicable to tort claims for breach of fiduciary duty.  Thus the claims for Bolton and Spireas's breach of their fiduciary duties are timely.[13]

4.      Equitable Action for Accounting

Defendants argued that Plaintiff's accounting claim must be dismissed because Defendants are not fiduciaries of Plaintiff.  (Bolton Mem. 18; Spireas Mem. at 22.)  Because St. John's has adequately alleged the existence of a fiduciary relationship with Bolton and Spireas this objection is without merit.[14]  Kastle v. Steibel, 120 A.D.2d 868, 869 (3d Dep't 1986); New Yorkers Producing Corp. v. Moss, 237 A.D. 567, 569 (1st Dep't 1933).  Moreover, Plaintiff's action for an accounting is timely because it is predicated on the alleged breach of a fiduciary duty, and thus is subject to the limitations period applicable to Plaintiff's fiduciary duty claims. See Loengard v. Santa Fe Industries, Inc., 70 N.Y.2d 262, 266 (1987) (analyzing the substance of the claim to determine what limitations period applies).

**E.      Spireas's Vicarious Liability for Bolton's Breaches of Fiduciary Duty and Contract**

Plaintiff alleges that Spireas is liable for: (1) aiding and abetting Bolton's breach of his fiduciary duties to St. John's; and (2) tortiously interfering with Bolton's contractual relations

---

[13]      Even if the fiduciary relationship terminated more than six years before the commencement of this action, the breach of fiduciary duty claims sound in fraud and may claim the benefit of the two-year discovery accrual rule applicable to fraud claims.  See infra Part II.I.1.

[14]      It is unclear whether Plaintiff's allegations of fact satisfy all elements of a claim for an accounting, but because Defendants' challenge to the accounting claim addressed only whether there was an underlying fiduciary relationship, the court does not reach other possible challenges.  See Pressman v. Estate of Steinvorth, 860 F. Supp. 171, 179 (S.D.N.Y. 1994) ("A party seeking an accounting must first establish four conditions: (1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal.") (quotation omitted); see also IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (claim for accounting not warranted where plaintiff may use the "tools of discovery" to establish its allegations as to damages).

with St. John's.  Spireas argues that Plaintiff has failed to allege facts sufficient to state a claim against him, and that the claims are time-barred under the relevant statutes of limitations.

      1.      <u>Aiding and Abetting Breach of Fiduciary Duty</u>

"The elements of a cause of action for participation in a breach of fiduciary duty are: breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages."  <u>SCS Commc'ns, Inc. v. Herrick Co., Inc.</u>, 360 F.3d 329, 342 (2d Cir. 2004); <u>see also</u> <u>S & K Sales Co. v. Nike, Inc.</u>, 816 F.2d 843, 847-48 (2d Cir. 1987).  Spireas argued that Plaintiff failed to state a claim against him because it failed to allege a primary breach of fiduciary duty by Bolton.  Because St. John's has adequately alleged that Bolton breached his fiduciary duties to St. John's, this objection is without merit.

The statute of limitations applicable to a claim that the defendant aided and abetted another's breach of his fiduciary duties is subject to the same limitations period applicable to the underlying breach of fiduciary duty.  <u>Balta v. Ayco Company, LP</u>, 626 F. Supp. 2d 347,359-60 (W.D.N.Y. 2009).  On the basis of the court's conclusion that Bolton's fiduciary duty did not terminate until he openly repudiated it in November 2008, <u>see</u> <u>supra</u> Part II.D.3, the aiding and abetting claim is thus timely.  In addition, because the breach of fiduciary duty claims asserted against Bolton in this action sound in fraud, <u>see</u> <u>infra</u> Part II.I.1, the limitations period applicable to fraud claims applies to Plaintiff's primary fiduciary breach claim against Bolton as well as the aiding and abetting claim against Spireas.  <u>SEC v. Lee</u>, Nos. 08-CV-9961 et al., 2010 WL 2594280, at *10 n.18 (S.D.N.Y. June 18, 2010).  Thus, the aiding and abetting claim is timely.

      2.      <u>Tortious Interference with Contract</u>

"Under New York law, the elements of a tortious interference with contract claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the

third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001). While there appears to be some inconsistency[15] in the New York courts as to the proof of causation required to establish a tortious interference claim, the Second Circuit has held that "a plaintiff must show that the third party would not have breached the contract 'but for the activities of the defendant.'" Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc., 173 F.3d 845, 1999 WL 236895, at *1 (2d Cir. Apr. 15, 1999) (unpublished table decision) (quoting Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 828 (2d Cir. 1990)).

Plaintiff has stated claims for breach of contract against Bolton, and that these breaches harmed Plaintiff. While Plaintiff has the ultimate burden of proving by a preponderance of the evidence that Spireas had actual knowledge of Bolton's contractual obligations to St. John's, on a motion to dismiss it is sufficient for Plaintiff to allege facts from which the court might reasonably infer that Spireas had such knowledge. Kaufman, 307 A.D.2d at 125. Plaintiff has adequately alleged that Spireas knew of Bolton's contractual obligations to St. John's insofar as St. John's has alleged that the Patent Policy, by its terms, clearly applied to both Bolton and Spireas, and obligated both of them to assign patentable inventions to St. John's. Spireas's knowledge of the Bolton Research Agreement's revenue-sharing provision presents a slightly different case because Plaintiff does not allege that Spireas was bound by similar obligations in his own agreements with St. John's. Bolton's and Spireas's alleged efforts to prevent St. John's from learning of the inventions and asserting its contractual rights, provide a factual basis to infer

---

[15]    Compare Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd., 35 A.D.3d 317, 318 (1st Dep't 2006) ("A cognizable claim for tortious interference does not require an allegation that the defendant's conduct was the sole proximate cause of the alleged harm."), with Burrowes v. Combs, 25 A.D.3d 370, 373 (1st Dep't 2006) ("[A] plaintiff must allege that the contract would not have been breached 'but for' the defendant's conduct."). See also Union Carbide Corp. v. Montell N.V., 944 F. Supp. 1119, 1138 (S.D.N.Y. 1996) (distinguishing Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 828 (2d Cir. 1990)).

that Spireas actually knew of St. John's rights to a portion of the revenues. It is also reasonable to infer from the context of Spireas's long tenure as a student and researcher at the University that he would know that St. John's shared in the royalties obtained from patents derived from research conducted at the University. <u>See</u> Restatement (Second) of Torts § 766 cmt. i (plaintiff required to establish only that the actor knew of the existence of a contract, and that he was interfering with its performance, "it is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty"). Accordingly, Plaintiff has adequately alleged that Spireas actually knew of Bolton's contractual obligation to assign the Liquisolid Patents and share licensing royalties.

Furthermore, it is reasonable to infer from the Complaint that Spireas intentionally procured this breach. An actor intentionally procures a breach of a third party's contract even where the breach "is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." Restatement (Second) of Torts § 766 cmt. j. Plaintiff's case is largely premised on the theory that Bolton and Spireas intentionally failed to disclose the value of their research to St. John's in order to keep the Liquisolid Patents and licensing royalties for themselves. Any royalties Bolton might have shared with St. John's, or any assignment Bolton might have made of his interests in the Liquisolid Patents, would have been glaring evidence of Defendants' fraud that would have alerted St. John's to the existence of its claims against Spireas. It is reasonable to infer that Spireas knew that Bolton's breach of the Agreements was necessary to the fulfillment of his scheme to retain his interests in the Liquisolid Patents and the licensing royalties, even if Bolton's breach of the Agreements was incidental to that scheme.

It is also reasonable to infer that Spireas's failures to perform the contractual duties he owed to St. John's, as well as his assignment of his interests in the Liquisolid Patents to Hygrosol were a "but for" cause of Bolton's breach. The inducement causing the breach "may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other. . . . [I]t may be the promise of a benefit to the third person if he will refrain from dealing with the other." Restatement (Second) of Torts § 766 cmt. k. Had Spireas complied with his fiduciary and contractual duties to disclose the patentability of the inventions and assign his interest in the Liquisolid Patents to St. John's, St. John's would have been alerted to Bolton's interests in the Liquisolid Patents and Bolton would have had little choice but to comply with his contractual obligations to assign them and share royalty revenues with St. John's. But for Spireas's actions in breaching his contractual and fiduciary duties to St. John's and assigning the Liquisolid Patents to Hygrosol, Bolton would not have obtained any benefit from breaching his Agreements with St. John's. Drawing all reasonable inferences in favor of the Plaintiff, St. John's has alleged facts sufficient to state a claim that Spireas tortiously interfered with Bolton's contracts with St. John's.

Plaintiff's cause of action for tortious interference with contract is subject to the three-year limitations period imposed by N.Y. C.P.L.R. § 214(4). Under New York law a tortious interference with contract claim accrues when the tort is completed—ordinarily when Plaintiff sustains damages. Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (1993). Although Plaintiff was in breach of the Agreements with St. John's when it came time for him to perform by at least a the dates the Liquisolid Patents issued, see supra Part II.C.4.a, the tort of interference with contractual relations is not necessarily completed on the date the contract is breached. "[T]he

contractual breach is a result of the tortious breach and, in large measure, simply a link in the causal chain between defendant's wrongful act and plaintiff's injury." Id. at 96.

Plaintiff did not sustain damages as a result of Spireas's interference with Bolton's assignment obligation until Bolton assigned his interests in the Liquisolid Patents to Hygrosol and St. John's was no longer capable of obtaining the benefit of its bargain—title to the Liquisolid Patents—from Bolton. For the reasons explained supra Part II.C.4.a, the court cannot conclude that the assignments occurred before they were registered with the PTO on October 12, 2006, a date clearly within the three-year limitations period. Plaintiff's claims against Spireas for interference with Bolton's assignment obligation are timely.

Plaintiff's tortious interference claims in respect of Bolton's breach of his contractual revenue-sharing obligation accrued when Bolton received royalties and failed to share them with Plaintiff, and are timely insofar as they relate to royalties received by Bolton within three years of the commencement of this action. Any claims to royalties received outside of the limitations period are untimely absent Plaintiff's ability to establish that it is entitled to equitable tolling of the statute of limitations. See infra Part II.I.2.

F.     Fraud

Plaintiff alleges two claims that sound in fraud. The Complaint includes a tort claim against Bolton and Spireas for fraudulent concealment, and an equitable fraudulent conveyance claim against Bolton, Spireas, and Hygrosol.

1.     Fraudulent Concealment

Plaintiff's theory of fraudulent concealment is that Bolton's and Spireas's failures to disclose material facts relating to the value and patentability of the inventions and the revenues obtained therefrom constituted affirmative misrepresentations to St. John's that no patentable

inventions existed. (Opp. at 17, 25-29.) Defendants respond that Plaintiff has: (1) failed to state a cause of action for fraudulent concealment by failing to allege any affirmative act concealing the existence of the Liquisolid Patents; (2) failed to plead fraud with particularity; and (3) failed to allege facts creating a strong inference of fraudulent intent. (Bolton Mem. at 16-17; Spireas Mem. at 14-15, 23-24.)

"It is well settled that when there is a duty to speak, silence may very well constitute fraudulent concealment, which is itself the equivalent of affirmative misrepresentations of fact." Guardian Life Ins. Co. of America v. Handel, 190 A.D.2d 57 (1st Dep't 1993) (citing Donovan v. Aeolian Co., 270 N.Y. 267, 271 (1936), and Nasaba Corp. v. Harfred Realty Corp., 287 N.Y. 290, 295 (1942) ("Concealment with intent to defraud of facts which one is duty-bound in honesty to disclose is of the same legal effect and significance as affirmative misrepresentations of fact.")). Having determined that, on the facts alleged, Bolton and Spireas owed a duty to disclose to St. John's material facts relating to the inventions that are disclosed in the Liquisolid Patents, see supra Part II.D.1, Plaintiff has stated a claim that Bolton and Spireas fraudulently concealed the inventions and resulting Liquisolid Patents and royalties by failing to perform that duty.

Rule 9(b) requires that a plaintiff pleading fraud "state with particularity the circumstances constituting fraud. . . ." Fed. R. Civ. P. 9(b); see also Solow v. Stone, 994 F. Supp. 173, 182 (S.D.N.Y. 1998) (applying Rule 9(b) heightened pleading standard to fraudulent concealment claim). As Judge Irizarry has explained:

> In the case of fraudulent concealment or omission, where the plaintiff is unable to specify the time and place because no act occurred, the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud.

Watts v. Jackson Hewitt Tax Serv. Inc., 579 F. Supp. 2d 334, 350 (E.D.N.Y. 2008) (quotation omitted). The Complaint includes allegations that neither Bolton nor Spireas have ever disclosed material facts relating to their inventions, the Liquisolid Patents, or royalties to St. John's. The allegations indicate that these omissions misled St. John's into believing that the inventions to which it is entitled did not exist, because under the circumstances St. John's had no reason to know of their existence absent Bolton's and Spireas's disclosure. Finally St. John's alleges that as a result of this fraud, Bolton and Spireas have retained the Liquisolid Patents and royalties to which it is entitled. Plaintiff's allegations of fraud satisfy the heightened pleading standard of Rule 9(b).

Under New York law there are two types of fraud: "actual fraud," which "involves the element of deceit practiced upon the party defrauded," Nasaba Corp., 287 N.Y. at 294; and "constructive fraud," which includes "a fiduciary's simple nondisclosure of facts it is obligated to disclose," in the absence of an intent to deceive. Whitney Holdings, Ltd. v. Givotovsky, 988 F. Supp. 732, 744 (S.D.N.Y. 1997). Plaintiff has alleged that Defendants' actions constituted "actual fraud" under New York law, because Plaintiff alleges that Defendants intentionally failed to disclose material facts relating to the value of their inventions in order to prevent Plaintiff from asserting its rights to the inventions, and to keep the Liquisolid Patents and royalties for themselves. Kaufman, 307 A.D.2d at 119-20.

Under Rule 9(b), Plaintiff need not allege intent with particularity, but Plaintiff's factual allegations must create a strong inference of fraudulent intent. "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273,

290-91 (2d Cir. 2006) (quotations omitted). Bolton's and Spireas's motive—retention of the Liquisolid Patents and royalties—is clear from the allegations of fact. Bolton and Spireas also had the opportunity to defraud St. John's because, as alleged in the Complaint, they knew that St. John's would not know of the existence or patentability of the inventions and assert their rights to them, unless Bolton and Spireas disclosed those facts to St. John's. Accordingly, the Complaint adequately alleges facts which create a strong inference of fraudulent intent.

        2.     <u>Fraudulent Conveyance</u>

Plaintiff alleges that Bolton's and Spireas's assignments of the Liquisolid Patents to Hygrosol were fraudulent conveyances in violation of New York law. Specifically, Plaintiff claims that Bolton and Spireas assigned the Liquisolid Patents to Hygrosol knowing that they had contractual duties to assign them to St. John's, and with the intent that the assignments to Hygrosol would render them incapable of performing their contractual duties. (Opp. at 35-36.) Defendants respond that Plaintiff has failed to plead fraudulent intent with particularity. (Bolton Mem. at 15-16; Spireas Mem. at 23.)

Under New York law, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276 ("DCL § 276"). "[A] transfer made with actual intent to hinder, delay, or defraud present or future creditors is fraudulent as to such creditors, regardless of whether the debtor receives fair consideration for its property." <u>HBE Leasing Corp. v. Frank</u>, 48 F.3d 623, 639 (2d Cir. 1995) (citing <u>United States v. McCombs</u>, 30 F.3d 310, 327-28 (2d Cir. 1994)).

Actual intent to hinder, delay, or defraud must be pleaded with specificity under Rule 9(b). <u>In re Sharp Int'l Corp.</u>, 403 F.3d 43, 56-57 (2d Cir. 2005). To meet this burden, a plaintiff

must allege specific objective facts—"badges of fraud"—giving rise to a reasonable inference of fraudulent intent.  Id.  These badges of fraud include evidence such as: (1) gross inadequacy of consideration; (2) a close relationship between transferor and transferee; (3) the transferor's insolvency as a result of the conveyance; (4) a questionable transfer not in the ordinary course of business; (5) secrecy in the transfer; (6) retention of control, possession, benefit, or use of the property by the transferor after the conveyance; and (7) the general chronology of the events and transactions under inquiry.  See In re Kaiser, 722 F.2d 1574, 1582-83 (2d Cir. 1983); Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 374-75 (S.D.N.Y. 2003).  Bolton's and Spireas's assignments of the Liquisolid Patents, as alleged in the Complaint, bear at least four of these seven "badges of fraud."

First, Plaintiff has alleged that Bolton and Spireas received grossly inadequate consideration in exchange for assigning the Liquisolid Patents to Hygrosol.  In a related context, courts assess the fairness of consideration supporting a transfer under DCL §§ 272 and 273 by measuring the value of the economic benefits the debtor received from the transaction against the value of the property transferred.  HBE Leasing, 48 F.3d at 638-39.  Adequacy of consideration necessarily depends on the facts of a particular case, McCombs, 30 F.3d at 326, but courts assess whether the debtor received a "'fair equivalent' or an 'amount not disproportionately small as compared with the value of the property, or obligation obtained [from the debtor].'"  HBE Leasing, 48 F.3d at 638 (quoting DCL § 272).  The same approach is also appropriate in assessing whether the consideration received by the transferor was grossly inadequate so as to give rise to an inference of fraudulent intent.  Here, Plaintiff has alleged that Bolton and Spireas formed Hygrosol for the sole purpose of holding their interests in the Liquisolid Patents.  Until the Liquisolid Patents were transferred to Hygrosol it held no assets, and thus it possessed

nothing it could convey to Bolton and Spireas in exchange. Accepting these allegations of fact as true, it is reasonable to infer that Bolton and Spireas received grossly inadequate consideration for the assignments to Hygrosol.

Second, the relationship between Bolton and Spireas as transferors, and Hygrosol as transferee, was extremely close—Plaintiff has alleged that Bolton and Spireas incorporated and were the sole shareholders of the company at the time of the transfer. Third, even after transferring the Liquisolid Patents to Hygrosol, Plaintiff alleges that Bolton and Spireas have retained full control over the Liquisolid Patents, and enjoy all the benefits of patent ownership through their complete control over Hygrosol's affairs.[16] As alleged in the Complaint, the royalties received by Hygrosol under its patent licensing agreements, the most important benefit of patent ownership, simply pass through the corporation to Bolton and Spireas.

Fourth, there was considerable secrecy in the transfer of Bolton's and Spireas's ownership interests in the Liquisolid Patents. Under patent law an assignee may perfect its ownership interest in a patent by publicly recording the assignment with the PTO. See 35 U.S.C. § 261. Although the PTO's records indicate that Hygrosol represented to the PTO that Bolton and Spireas assigned the Liquisolid Patents to it in 1998, the transfer was not publicly recorded with the PTO until 2006.[17] Assuming that the representations to the PTO were accurate and the assignments occurred in 1998, the implication is that Hygrosol elected not to avail itself of the legal protections afforded by recording the assignments for nearly eight years. Until the patent assignments were recorded with the PTO there was no public record of the assignments, and the only third party with knowledge of the assignments was the third party to which Hygrosol

---

[16]    Plaintiff has also alleged that Hygrosol is the alter ego of Bolton and Spireas. (Compl. ¶ 162.) While this allegation is a conclusion of law the court gives no weight in deciding this motion, it is notable in that it is one of the few claims Defendants have not attacked in their briefs.

[17]    See supra Part II.C.4.a n.10.

licensed the Liquisolid Patents.

Under the circumstances, Plaintiff's allegations of fact support a strong inference that Bolton and Spireas assigned the Liquisolid Patents to Hygrosol with the intent to defraud Plaintiff. Therefore, Plaintiff has alleged facts from which it can reasonably be inferred that the Liquisolid Patent assignments were fraudulent conveyances under DCL § 276.

### G. Conversion

In New York, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." State of New York v. Seventh Regiment Fund, Inc., 98 N.Y.2d 249, 259 (2002) (quotation omitted). However, "[c]onversion is concerned with possession, not with title," and a plaintiff need not have title to the property allegedly converted in order to make out a claim for conversion. Id. (quotation omitted). The two elements of conversion are "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 50 (2006) (citations omitted).

Plaintiff alleges that it has a right to possession of the Liquisolid Patents under the Agreements, and that Defendants have exercised dominion over the property in derogation of those rights. Bolton and Spireas argue that the conversion claim against them merely duplicates the Plaintiff's contract claims because Plaintiff has failed to allege wrongful behavior independent of their alleged breaches of contract which would entitle Plaintiff to special damages. (Spireas Mem. at 21-22.) All Defendants object that Plaintiff's conversion claims are untimely under the statute of limitations. (Spireas Mem. at 21; Bolton Mem. at 10-11.)

1.    <u>Availability of Special Damages</u>

Under New York law, "[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." <u>Clark-Fitzpatrick, Inc., v. Long Island R.R. Co.</u>, 70 N.Y.2d 382, 389 (1987); <u>see also</u> <u>Rockefeller Univ. v. Tishman Construction Corp.</u>, 240 A.D.2d 341 (1st Dep't 1997) (plaintiff cannot maintain a cause of action in tort for conduct that is governed by a contractual relationship when "the identical contractual benefit of the bargain recovery is sought"). Consequently, where a contractual relationship exists between the plaintiff and a defendant, a plaintiff may only maintain a tort action for fraud where the plaintiff "(i) demonstrate[s] a legal duty separate from the duty to perform under the contract; or (ii) demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek[s] special damages that are caused by the misrepresentation and unrecoverable as contract damages." <u>Bridgestone/Firestone,</u> <u>Inc. v. Recovery Credit Servs., Inc.</u>, 98 F.3d 13, 20 (2d Cir. 1996).

The conversion claim is not duplicative of St. John's contract claims against Bolton and Spireas because success on the conversion claim may entitle Plaintiff to special damages. Punitive damages "may be recovered for an act of conversion where the circumstances establish that the conversion was accomplished by malice or reckless or willful disregard of the plaintiff's right." <u>Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.</u>, 106 Misc.2d 866, 870 (N.Y. Sup. Ct. 1980), <u>modified on appeal to delete punitive damages</u>, 81 A.D.2d 650, 650 (2d Dep't 1981), <u>aff'd</u>, 54 N.Y.2d 891, 892 (1981); <u>see also</u> <u>Caballero v. Anselmo</u>, 759 F. Supp. 144, 153-54 (S.D.N.Y. 1991) (punitive damages available for conversion where Plaintiff proves Defendant's malice or reckless disregard of Plaintiff's rights). "The act is malicious when the thing done is with the knowledge of plaintiff's rights, and with the intent to interfere therewith. In a legal

sense it means a wrongful act, done intentionally, without just cause or excuse."  <u>Lamb v. S.</u>
<u>Cheney & Son</u>, 227 N.Y. 418, 422 (1920).

It is reasonable to infer from the facts alleged in the Complaint that Bolton and Spireas knew of Plaintiff's rights and deliberately and intentionally interfered with them.  <u>See</u> <u>Ashare</u>, 106 Misc.2d at 869 (citing <u>Lamb</u>, 227 N.Y. at 422).  As recounted numerous times in this Memorandum and Order, the factual essence of Plaintiff's action is that Bolton and Spireas knew that St. John's had rights to the assignment of the Liquisolid Patents and had a duty to inform St. John's of the value of their research and the resulting patents.  In spite of this duty and Plaintiff's rights, Bolton and Spireas deliberately failed to inform St. John's of the existence or value of their inventions, the Liquisolid Patents, and resulting royalties, and took steps to prevent St. John's from asserting its rights, including by assigning the Liquisolid Patents to Hygrosol. Accordingly, Plaintiff has stated a claim to punitive damages against Bolton and Spireas and has stated a claim for conversion against Bolton and Spireas.

2.    <u>Statute of Limitations</u>

New York applies a three-year statute of limitations for conversion.  N.Y. C.P.L.R. § 214(3).  "A cause of action for conversion accrues when all of the facts necessary to sustain the cause of action have occurred, so that a party could obtain relief in court."  <u>Seventh Regiment</u>, 98 N.Y.2d 249, 259 (2002) (quotation omitted).  A cause of action for conversion is complete when the party in possession of the property openly interferes with the true owner's rights in it.  <u>Id.</u> at 260-61.  If the party in possession has not acquired possession wrongfully, and has not otherwise exercised wrongful dominion over the property, the possessor does not convert the property until he refuses a demand for its return from a party with a superior and immediate right of possession. <u>Id.</u>; <u>MacDonnell v. Buffalo Loan, Trust & Safe Deposit Co.</u>, 193 N.Y. 92, 101 (1908).  With

respect to intangible property, an interference occurs when the party in possession acts in a manner incompatible with the plaintiff's rights in the property.  See Seventh Regiment, 98 N.Y.2d at 261.  The court must determine when Defendants first interfered with Plaintiff's rights with respect to the Liquisolid Patents in order to determine when the conversion was completed and the statute of limitations began to run.  The court analyzes Bolton's and Spireas's statute of limitations defense first, and then Hygrosol's.

Bolton and Spireas argue that by dealing openly with the Liquisolid Patents as their own—i.e., by filing the patent applications, obtaining the Liquisolid Patents in their names as inventors, and subsequently assigning them to Hygrosol—they interfered with St. John's rights to the Liquisolid Patents and the statute of limitations began to run.  (Bolton Mem. at 10-11; Spireas Mem. at 21.)  Bolton argues that because these events occurred outside the limitations period, Plaintiff's claims are time-barred.  (Id.)

From the allegations in the Complaint, Bolton's and Spireas's initial ownership and possession of the Liquisolid Patents was not wrongful. Under federal law a patent is issued to the inventors, who are the owners of the patent in the first instance, unless and until they assign it.[18] St. John's allegations as to the patent-assignment terms in the Agreements—the source of Plaintiff's right of possession—demonstrate that the parties contemplated that St. John's would obtain ownership of the Liquisolid Patents only after Bolton and Spireas performed their contractual duty to assign them to St. John's.  In the absence of the additional step of assigning the Liquisolid Patents to St. John's, St. John's did not "own" them, and thus Bolton's and Spireas's initial acts in acquiring title to the Liquisolid Patents were not necessarily inconsistent with St. John's ownership rights under the Agreements.  Indeed, they may have been

---

[18]     See 35 U.S.C. §§ 111 (patent application to be made by inventor), 116 (joint inventors to file jointly), 118 (application by others only as agent for inventor), 152 (patent issued to assignee if designated on application), 261 (applicant or his assigns owns patent; patent to be treated as personal property and subject to assignment).

contemplated by the Agreements.  (See Lundin Decl. Ex. 3 (requiring Bolton to use "reasonable diligence to secure necessary patents").)  Therefore Bolton's and Spireas's initial application for and ownership of the Liquisolid Patents did not constitute conversion, and did not commence the running of the statute of limitations.

Bolton and Spireas argue that Plaintiff's cause of action for conversion accrued at least by the time they assigned the Liquisolid Patents to Hygrosol.  (Bolton Mem. at 10.)  Plaintiff responds that a person who comes lawfully into possession of personalty does not convert it until he refuses a demand for its return from the true owner.  (Opp. at 40.)  Plaintiff's argument, however, states only half the law.  The New York Court of Appeals has consistently held that a cause of action for conversion against a bona fide purchaser accrues *either* after demand and refusal *or* earlier, when a bona fide purchaser openly takes action in respect of the property which is inconsistent with the true owner's rights.  See, e.g., MacDonnell, 193 N.Y. 92, 101 (1908) ("The rule that one who comes lawfully into possession of property cannot be charged with conversion thereof, until after a demand and refusal, is too well established to justify extended discussion. But it has no application in a case where the lawful custodian of property commits an overt and positive act of conversion by an unlawful sale or disposition of the same.") (citations omitted); Pease v. Smith, 61 N.Y. 477, 480-81 (1875) ("So long as the defendants had exercised no act of ownership over the property, and had acted in good faith, a demand and refusal would be necessary to put them in the wrong and to constitute conversion. Until such demand, there is no apparent inconsistency between their possession and the plaintiffs' ownership.").  Language in the New York Court of Appeals' opinion in Seventh Regiment, 98 N.Y.2d at 260-61, could be misread to suggest that the law has changed, and that a cause of action for conversion against a lawful possessor accrues *only* after the lawful possessor refuses a

demand from the true owner.  See id. ("If [the Fund was a bona fide purchaser], the State's claim will have accrued only after demand and refusal.").  But in <u>Seventh Regiment</u> the court considered only whether the defendant's mere acquisition of the property in a "private paper transaction" would be sufficient to constitute a conversion where there was no allegation of subsequent action by the purchaser incompatible with the rights of the true owner.  <u>Id.</u> at 260-61.  The court was clear that an affirmative act interfering with the true owner's rights in the property—even by a good faith purchaser for value—would complete the conversion, and distinguished the facts before it on the ground that they did not indicate such an affirmative act.  <u>Id.</u> at 260.

Bolton's and Spireas's assignment of the Liquisolid Patents to Hygrosol was an exercise of dominion over the Liquisolid Patents inconsistent with St. John's rights, and was an affirmative act constituting conversion.  However, on the facts alleged the court cannot conclude that the assignments occurred before they were registered with the PTO on October 12, 2006,[19] a date clearly within the three-year limitations period.  Accordingly, Bolton and Spireas have failed to establish that Plaintiff's conversion claims against them are untimely from the face of the Complaint.

If Hygrosol were a bona fide purchaser of the Liquisolid Patents, Plaintiff's claims for conversion would not accrue against Hygrosol until it refused Plaintiff's demands for assignment of the Liquisolid Patents, or Hygrosol openly exercised dominion and control over the Liquisolid Patents to the exclusion of St. John's rights.  Plaintiff demanded assignment of the Liquisolid Patents from Hygrosol by making the demand to Bolton and Spireas, its sole shareholders, in November 2008.  However, according to the Complaint, Hygrosol took at least two other acts

---

[19]     <u>See</u> <u>supra</u> Part II.C.4.a n.10.

incompatible with Plaintiff's rights in the Liquisolid Patents before St. John's demand and Hygrosol's refusal.

Hygrosol recorded the assignments with the PTO on October 12, 2006,[20] an open expression of dominion incompatible with Plaintiff's rights to the Liquisolid Patents, but a date still within the three-year limitations period. Even if the court assumes that the assignments to Hygrosol actually occurred earlier than the date of their recordation,[21] the mere assignment of the Liquisolid Patents by Bolton and Spireas to an entity of their own creation were simply "private paper transactions" which would be insufficient to constitute a conversion by Hygrosol until it recorded them in 2006. Seventh Regiment, 98 N.Y.2d at 259-60; see id. 252-53 (holding that transfer of chattels to entity created by affiliates of the transferor, for nominal consideration, and without physically moving the property, was not an open exercise of dominion by the transferee inconsistent with true owner's rights).

Plaintiff also alleges that Hygrosol commercially exploited the Liquisolid Patents by licensing them to a third party. Under New York law, the commercial exploitation of personal property is an interference with the rights of the true owner sufficient to constitute conversion. Id. at 260 (listing a possessor's commercial exploitation of property as an affirmative act sufficient to constitute conversion); SongByrd, Inc. v. Estate of Grossman, 206 F.3d 172, 182-83 (2d Cir. 2000) (possessor's licensing of recordings held to interfere with true owner's rights). However, the Complaint alleges that "the vast bulk of the licensing revenues was received by Defendants on or after January 1, 2006," (Compl. ¶ 160), and does not otherwise allege the date on which Hygrosol licensed the Liquisolid Patents to third parties. If the court were to use the January 1, 2006 date as the accrual date for the conversion claim against Hygrosol, the cause of

---

[20]    See supra Part II.C.4.a n.10.

[21]    See supra Part II.C.4.a n.10.

action would be timely.  Therefore, Hygrosol has failed to establish that Plaintiff's claim against it for conversion is untimely from the face of the Complaint.[22]

### H.    Unjust Enrichment

Plaintiff alleges that Defendants have been unjustly enriched at its expense, and that it is entitled, in equity and good conscience, to the Liquisolid Patents and a share of the resulting royalty payments.  Defendants (1) attack the sufficiency of the unjust enrichment claim; (2) argue that it impermissibly duplicates Plaintiff's contract claims; and (3) argue that the claim is untimely under the relevant statute of limitations.

#### 1.    Sufficiency of Unjust Enrichment Claim

To make out a claim for unjust enrichment, a plaintiff must establish, "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  Beth Israel Medical Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc., 448 F.3d 573, 586-87 (2d Cir. 2006) (quoting Goldman v. Metropolitan Life Ins. Co., 5 N.Y.3d 561, 572 (2005)).  "To plead a plausible claim to relief on a theory of unjust enrichment, plaintiffs must show a causal 'nexus' between a defendant's enrichment and their own expense that goes beyond mere 'correlation.'"  Network Enterprises, Inc. v. Reality Racing, Inc., No. 09 Civ. 4664 (RJS), 2010 WL 3529237, at *7 (S.D.N.Y. Aug. 24, 2010).  "The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  Paramount Film Distributing Corp. v. State of New York, 30 N.Y.2d 415, 421 (1972).

---

[22]      While Plaintiff's separate allegations that the assignments to Hygrosol were fraudulent conveyances and that Hygrosol is the alter ego of Bolton and Spireas are arguably inconsistent with the theory that Hygrosol was a bona fide purchaser for value and without notice, Plaintiff is permitted to plead causes of action in the alternative, and on a motion to dismiss the court may not dismiss an alternative claim if there are allegations of fact in the Complaint sufficient to state a claim for relief.  See infra Part II.H.2.  Because there is at least one plausible theory of conversion against Hygrosol which is timely, the court may not dismiss this claim on statute of limitations grounds.

Therefore, in assessing the legal sufficiency of an unjust enrichment claim, courts "will also look to see if defendant's conduct was tortious or fraudulent." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine, 221 A.D.2d 284, 286-87 (1st Dep't 1995).

Bolton and Spireas argue that St. John's has failed to identify any benefit it conferred on the Defendants on which it could base a claim for unjust enrichment. Specifically, Bolton objects that: (1) the resources provided by St. John's, *i.e.*, Bolton's salary, were provided to all faculty and staff of the university and are unrelated to discovery of the invention; and (2) that the research was performed off-campus at Ciba-Geigy, and hence St. John's did not confer significant benefits on Defendants in relation to the inventions. (Bolton Mem. at 15; Spireas Mem. at 20; Bolton Reply at 9.)

St. John's alleges that it provided Bolton and Spireas with the resources to conduct the research resulting in the inventions disclosed in the Liquisolid Patents. St. John's has also alleged that while it provided these resources to Bolton and Spireas with the understanding that it would receive a share of any of the benefits of that research obtained by Bolton and Spireas, the two have failed to share those benefits with it and have retained the Liquisolid Patents and royalty payments for themselves. Furthermore, as discussed extensively in this Memorandum and Order, Plaintiff's allegations of Bolton's and Spireas's conduct with respect to the inventions "border[] on the larcenous and equity does not favor allowing [Bolton and Spireas] to escape restitution." Merrill Lynch, 221 A.D.2d at 286-87. Bolton's argument that St. John's did not confer a benefit on Bolton and Spireas because the research was conducted at Ciba-Geigy fails to address St. John's allegation that Bolton and Spireas procured St. John's consent to the Ciba-Geigy arrangement by acknowledging St. John's rights to the research performed off-campus. (Compl. ¶¶ 78-86.)

Plaintiff has also stated a claim for unjust enrichment against Hygrosol. Plaintiff has alleged facts from which the court can infer that Hygrosol knew that St. John's had a right to ownership of the Liquisolid Patents but entered into the assignment agreement with Bolton and Spireas and has retained them despite Plaintiff's rights to the Liquisolid Patents. Plaintiff has alleged a clear causal link between a wrongful act, (Bolton's and Spireas's breach of their contractual obligations), and Hygrosol's enrichment, (the Liquisolid Patent assignments). This allegation is sufficient for the court to conclude that it would be unjust to allow Hygrosol to retain the Liquisolid Patents, and that Plaintiff has pleaded an equitable claim for unjust enrichment against Hygrosol.

2.      Pleading Unjust Enrichment in the Alternative to Breach of Contract

Defendants argue that Plaintiff fails to state a cause of action for unjust enrichment, because the conduct alleged to form the basis of this claim is governed by the contracts alleged in the Complaint. (Bolton Mem. at 11, 13-15; Spireas Mem. at 15-16.) This argument is plainly premature.

Unjust enrichment is a quasi-contract claim viable only in the absence of an enforceable agreement between the parties governing the subject matter of the dispute. Clark-Fitzpatrick, 70 N.Y.2d at 388. In this case, Defendants' arguments beg the question of what performance the Agreements required of the Defendants. Only after determining whether, and to what extent, the Agreements governed the parties' conduct in relation to the alleged inventions and patents can the court determine whether the claims are duplicative. However, the court is in no position to finally determine the meaning and effect of contracts the parties have not presented to it. Nor can the court determine whether conduct that has yet to be established falls within the scope of the alleged contracts.

At the pleading stage, Plaintiff is not required to guess whether it will be successful on its contract, tort, or quasi-contract claims. The Federal Rules of Civil Procedure explicitly permit Plaintiff to assert claims in the alternative. Under Rule 8(d)(2), "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Rule 8(d)(3) similarly provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Rule 8(d), formerly Rule 8(e), embodies a liberal approach to pleading which favors the resolution of cases on the merits of the plaintiff's claims. Henry v. Daytop Village, 42 F.3d 89, 95 (2d Cir. 1994); Seiden Assocs. v. ANC Holdings, Inc., 754 F. Supp. 37, 40 (S.D.N.Y. 1991) (holding that dismissal of plaintiff's alternative theory of unjust enrichment on motion to dismiss "would violate the liberal policy of [Rule 8(d)(2)] which allows plaintiffs wide latitude in framing their right to recover"). The Second Circuit has held that even where allegations are not specifically denominated as alternative claims "[Rule 8(d)] offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party as we must do in reviewing orders granting motions to dismiss." Adler v. Pataki, 185 F.3d 35, 41 (2d Cir. 1999). Rule 8(d) ameliorates the uncertainty inherent in all litigation at the pleading stage by permitting plaintiffs to allege claims in the alternative, even if the legal theories underlying those claims are technically inconsistent or contradictory.

The cases cited by Defendants are not to the contrary. Many courts dismissing tort and unjust enrichment claims as duplicative of contract claims have done so on a motion for summary judgment, with the benefit of a full factual record. See, e.g., Beth Israel, 448 F.3d at 578-579 (appeal from summary judgment); Bridgestone/Firestone, 98 F.3d at 16-17 (appeal from

judgment following bench trial); <u>Medical Research Assocs., P.C. v. Medcon Fin. Servs., Inc.</u>, 253 F. Supp. 2d 643, 649-50 (S.D.N.Y. 2003) (dismissing fiduciary duty and tortious interference claims as duplicative on motion for summary judgment).  Even in cases dismissing unjust enrichment claims as duplicative on a motion to dismiss, many courts have explicitly premised their decisions on the determination that the parties did not dispute the enforceability of the alleged contracts.  <u>See</u> <u>Network Enterprises, Inc.</u>, 2010 WL 3529237, at *8; <u>King's Choice Neckwear, Inc. v. Pitney Bowes, Inc.</u>, No. 09 Civ. 3980 (DLC), 2009 WL 5033960, at *7 (S.D.N.Y. Dec. 23, 2009).  Other courts have held that dismissal of unjust enrichment claims is inappropriate where there is a genuine dispute over the enforceability of the alleged contract. <u>See, e.g.</u>, <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996) ("[P]laintiff need not make a pretrial election between these theories; he is entitled to have the case submitted to the jury on both theories."); <u>Adams v. Labaton, Sucharow & Rudoff LLP</u>, No. 07 Civ. 7017 (DAB), 2009 WL 928143, at *7 (S.D.N.Y. Mar. 20, 2009) ("Because the Court cannot on these pleadings render a determination as to the existence of a contract between Parties, the Court makes no ruling at this point on the viability of these claims.").  Though some cases suggest that a plaintiff's mere allegation of an enforceable contract is enough to prevent him from even *pleading* an alternative claim for unjust enrichment,[23] that position cannot be reconciled with the text of Rule 8(d), and is unpersuasive to this court's analysis.

All of these cases make clear, however, that the threshold question is whether an enforceable contract exists that governs the subject matter underlying the unjust enrichment claim.  Though Defendants may well establish that the conduct underlying these claims should

---

[23]       <u>See, e.g.</u>, <u>King's Choice Neckwear</u>, 2009 WL 5033960, at *7 ("Unjust enrichment may be plead[sic] in the alternative where the plaintiff challenges the validity of the contract; it may not be plead in the alternative alongside a claim that the defendant breached an enforceable contract."); <u>Air Atlanta Aero Engineering Ltd. v. SP Aircraft Owner I, LLC</u>, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009) ("[Plaintiff's] failure to allege that the contracts at issue are invalid or unenforceable precludes it . . . from seeking quasi-contractual recovery for events arising out of the same subject matter.").

be governed by the Agreements, Defendants may also establish that no valid contracts exist or that the breaches alleged by Plaintiff were not breaches of duties governed by the contracts. In fact, Bolton and Spireas dispute the scope and enforceability of the assignment and revenue-sharing terms in the Agreements as alleged. (See Opp. at 31-32 (citing Bolton Mem. at 4, 17-18; Spireas Mem. at 4-7).) Even if the Agreements are enforceable, the court must still interpret them to determine whether the unjust enrichment claims arise out of the same subject matter. On the present motions to dismiss the court cannot finally determine the enforceability of the Agreements, and therefore denies Defendants' motions to dismiss the unjust enrichment claims as duplicative of Plaintiff's contract claims.

        3.    <u>Statute of Limitations</u>

"'Under New York law, an unjust enrichment claim accrues upon occurrence of the wrongful act giving rise to the duty of restitution.'" <u>Golden Pacific Bancorp</u>, 273 F.3d 509, 519 (2d Cir. 2001) (quoting <u>Plitman v. Leibowitz</u>, 990 F. Supp. 336, 337 (S.D.N.Y. 1998)). There are potentially two different limitations periods applicable to Plaintiff's unjust enrichment claims against Bolton and Spireas. If the unjust enrichment claims against Bolton and Spireas are derivative of the fiduciary relationships alleged by Plaintiff, they would be subject to the same limitations period applicable to its claims for fiduciary breach, and would thus be timely. <u>See</u> <u>Golden Pacific Bancorp</u>, 273 F.3d at 518-19 (holding that unjust enrichment claims premised on fiduciary breach obtained benefit of fiduciary tolling rule); <u>see also</u> <u>Loengard v. Santa Fe Industries, Inc.</u>, 70 N.Y.2d 262, 266 (1987) ("[T]he choice of the applicable Statute of Limitations depends on the substantive remedy which the plaintiff seeks."). If the unjust enrichment claims are unrelated to Bolton's and Spireas's fraudulent concealment of the Liquisolid Patents, Plaintiff's unjust enrichment claim is in the nature of a contract implied in

law and is subject to the six-year limitations period prescribed by N.Y. C.P.L.R. § 213(2), or § 213(1) as an action sounding in equity.  Under the latter theory of unjust enrichment, the wrongful acts giving rise to the duty of restitution were Defendants' failures to assign the Liquisolid Patents to St. John's and failures to pay St. John's a share of the royalty revenues to which it was entitled.  Accordingly, Plaintiff's unjust enrichment claims against Defendants would have accrued upon issuance of the Liquisolid Patents, for unjust enrichment claims predicated on failure to assign the Liquisolid Patents, and upon the receipt of the royalty payments for claims predicated on the failure to share revenues.  The unjust enrichment claims based on patent ownership would be time-barred because all of the Liquisolid Patents issued more than six years before the commencement of the action.  Claims based on revenue sharing would be untimely insofar as they relate to royalties received more than six years before the commencement of the action.  However, at this early stage of the litigation it is unclear under which theory Plaintiff proceeds, and thus Defendants have failed to establish that Plaintiff has alleged no claim that is timely under the statute of limitations.

The unjust enrichment claim against Hygrosol accrued when Hygrosol was unjustly enriched, *i.e.*, the dates the Liquisolid Patents were assigned to Hygrosol.  From the face of the Complaint the court cannot conclude that the assignments occurred more than six years before Plaintiff commenced this action, therefore the unjust enrichment claim against Hygrosol is timely. See supra Part II.C.4.a.

## I.    Plaintiff's Defenses to Application of the Statutes of Limitations

Though the statutes of limitations would ordinarily apply to bar some of Plaintiff's claims, two doctrines—the statutory discovery accrual rule for fraud claims and the doctrine of equitable tolling—if applicable, would render Plaintiff's claims timely.  The applicability of

these two doctrines depends in large part on the effect of the recordation and issuance of the

Liquisolid Patents by the PTO.

1.      Fraud Discovery Accrual Rule

"The New York statute of limitations for actual fraud is the longer of six years from the

date on which the fraud occurred, or two years from the time when the plaintiff discovered or,

with reasonable diligence, should have discovered the fraud." Serdarevic v. Advanced Medical

Optics, Inc., 532 F.3d 1352, 1362 (Fed. Cir. 2008); Kaufman, 307 A.D.2d 113, 119-22 (1st Dep't

2003) (citing N.Y. C.P.L.R. §§ 213(8) and 203(g)).  The fraud discovery accrual rule applies to

any claim that is predicated on an allegation of actual fraud.  See Kaufman, 307 A.D.2d at 119

(holding that fraud discovery accrual rule applies to claim for breach of fiduciary duty based on

allegations of actual fraud).  A plaintiff alleges actual fraud, as opposed to constructive fraud, by

pleading facts showing that the defendant had the intent to deceive and defraud the plaintiff.

Whitney Holdings, Ltd. v. Givotovsky, 988 F. Supp. 732, 748-49 (S.D.N.Y. 1997); Nasaba Corp.

v. Harfred Realty Corp., 287 N.Y. 290, 294 (1942) ("Actual fraud, as distinguished from

constructive fraud, involves the element of deceit practiced upon the party defrauded.").  To

invoke the fraud discovery accrual rule, the allegation of actual fraud must be essential and not

merely incidental to the action.  See Kaufman, 307 A.D.2d at 119.

As the court has already explained, Plaintiff has alleged that Defendants knowingly and

deliberately breached their fiduciary duties of full disclosure to St. John's and assigned the

Liquisolid Patents to Hygrosol with the intent to deceive and defraud St. John's.  This fraud is

not merely incidental but is essential to the action: Defendants' breaches of their agreements with

Plaintiff and their fraudulent concealment of those breaches are the two principal grievances

expressed in the Complaint.  Plaintiff's claims for breach of fiduciary duty, aiding and abetting

breach of fiduciary duty, fraud, and fraudulent conveyance are all predicated on an allegation of actual fraud and are therefore subject to the fraud discovery accrual rule.

### 2. Equitable Tolling[24]

"A defendant may be estopped from pleading the Statute of Limitations where a plaintiff was induced by fraud, misrepresentation, or deception to refrain from timely commencing an action." Gleason v. Spota, 194 A.D.2d 764, 765 (2d Dep't 1993). "'Where concealment without actual misrepresentation is claimed to have prevented a plaintiff from commencing a timely action, the plaintiff must demonstrate a fiduciary relationship . . . which gave the defendant an obligation to inform him or her of facts underlying the claim.'" Zumpano v. Quinn, 6 N.Y.3d 666, 673-74 (2006) (quoting Gleason v. Spota, 194 A.D.2d at 765). Once a defendant has established that the affirmative defense of the statute of limitations bars the plaintiff's claims, the burden is on the plaintiff to establish facts entitling him to equitable tolling. Simcuski v. Saeli, 44 N.Y.2d 442, 449 (1978). "Generally, the issue of whether a defendant should be equitably estopped from asserting the Statute of Limitations as an affirmative defense to the plaintiff's complaint is not a question of law, but rather a question of fact, which should be fully developed and determined upon the trial of the action." McIvor v. Di Benedetto, 121 A.D.2d 519, 522 (2d Dep't 1986) (quoting Schirano v. Pazzioli, 99 A.D.2d 802, 804 (2d Dep't 1984)).

---

[24] Some federal courts in this Circuit, and New York state courts, have attempted to draw a distinction between the doctrines of equitable estoppel and equitable tolling. But generally, "New York courts use the terms interchangeably 'to cover both the circumstances where the defendant conceals from the plaintiff the fact that he has a cause of action and where the plaintiff is aware of his cause of action, but the defendant induces him to forego suit until after the period of limitations has expired.'" Coleman & Co. Securities, Inc. v. Giaquinto Family Trust, 236 F. Supp. 2d 288, 299-300 (S.D.N.Y. 2002) (quoting Pearl v. City of Long Beach, 296 F.3d 76, 82-83 (2d Cir. 2002)); see also Kotlyarsky v. New York Post, 195 Misc.2d 150, 153 (N.Y. Sup. Ct. 2003) (distinguishing between the two). While the two doctrines appear to be functionally identical under New York law, federal courts in the Second Circuit would label the doctrine applicable in this action equitable tolling because Plaintiff alleges that Bolton's and Spireas's silence in spite of their duty to disclose prevented it from timely learning of its causes of action. Keitt v. City of New York, No. 09 Civ. 5663 (PKC) (DF), 2010 WL 3466175, at *9 n.14 (S.D.N.Y. Aug. 9, 2010). For the sake of clarity, the court uses the term equitable tolling in this Memorandum and Order.

Plaintiff has alleged that a special relationship of trust and confidence existed between it and Bolton and Spireas, such that Bolton and Spireas owed St. John's a fiduciary duty to disclose to St. John's material facts relating to their research. By failing to disclose their assessment of the value of their research at St. John's or the Liquisolid Patents that resulted from that research, Plaintiff alleges that Bolton and Spireas prevented St. John's from learning of and asserting its contractual rights to the Liquisolid Patents and licensing revenues, and that they have been harmed because they have not received the benefit of their contractual rights. Moreover, Plaintiff alleges Bolton's and Spireas's failure to disclose was fraudulent because they intentionally remained silent, in spite of their duty to disclose, to prevent Plaintiff from learning of its rights to the Liquisolid Patents and royalties. Plaintiff's allegations are sufficient to invoke the court's power to toll the statutes of limitations applicable to Plaintiff's claims.

However, "equitable estoppel does not apply where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying cause of action." Kaufman, 307 A.D.2d at 122. Therefore, equitable tolling does not apply to toll the limitations periods applicable to Plaintiff's claims premised on fraud (including Plaintiff's breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, and fraudulent conveyance claims) because those claims are based on the same acts of fraudulent concealment that entitle Plaintiff to invoke equitable tolling. See id. (reasoning that this limitation must apply to fraud claims because "the mere assertion of an underlying fraudulent act would always trigger equitable estoppel and render the discovery accrual rule for fraud actions superfluous"). However, Bolton's and Spireas's acts underlying the breach of contract, conversion, unjust enrichment, and tortious interference claims are their failures to assign the Liquisolid Patents and share licensing royalties with Plaintiff. Proof of Bolton's and Spireas's

fraud is not necessary to establish Plaintiff's entitlement to relief on those causes of action. Bolton's and Spireas's fraud is relevant to those claims only insofar as it tolls the limitations periods that apply to them. Thus Bolton's and Spireas's fraudulent concealment is not "the same act which forms the basis of plaintiff's underlying cause of action." Plaintiff has stated facts sufficient to invoke the doctrine of equitable tolling with respect to its breach of contract, conversion, unjust enrichment, and tortious interference claims.

        3.    <u>Notice</u>

"Equitable estoppel will not toll a limitations statute . . . where a plaintiff possesses timely knowledge sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations." <u>Gleason v. Spota</u>, 194 A.D.2d at 765 (quotations omitted). Similarly, for the discovery accrual rule applicable to fraud claims "[a]ll that is needed to commence the running of the statute is 'knowledge of facts sufficient to suggest to a person of ordinary intelligence the probability that he has been defrauded.'" <u>Renz v. Beeman</u>, 589 F.2d 735, 751 (2d Cir. 1978) (quoting <u>Sielcken-Schwarz v. American Factors, Ltd.</u>, 265 N.Y. 239, 246 (1934)). "The test as to when fraud should with reasonable diligence have been discovered is an objective one." <u>Armstrong v. McAlpin</u>, 699 F.2d 79, 88 (2d Cir. 1983). Thus, where the allegations in the complaint clearly show that a plaintiff possessed knowledge of facts imposing a duty to conduct an inquiry which would have led him to discover the fraud, courts have decided inquiry notice as a matter of law. <u>In re Integrated Resources Real Estate Ltd. Partnerships Secs. Litig.</u>, 815 F. Supp. 620, 637-39 (S.D.N.Y. 1993).

Bolton and Spireas contend that issuance of the Liquisolid Patents by the PTO gave St. John's constructive notice that their research at St. John's had produced patentable discoveries,

and that in the exercise of reasonable diligence Plaintiff should have learned of both the fraud and the facts underlying its claims on the dates the Liquisolid Patents issued. (Bolton Mem. at 6-10; Spireas Mem. at 10-11.)

Bolton's and Spireas's arguments raise three questions: (1) Whether a rule of federal law requires the court to impute knowledge of the Liquisolid Patents' existence and contents to Plaintiff on their dates of issuance in this case; (2) If not, whether New York law requires the court to impute knowledge of the Liquisolid Patents to Plaintiff on their dates of issuance; and (3) Whether Spireas's disclosure of his dissertation was sufficient to put St. John's on inquiry notice.

a.      Constructive Notice of Patent Issuance under Federal Law

In some of its older patent law jurisprudence, the Supreme Court has, on occasion, stated the principle that "issuance of a patent and recordation in the Patent Office constitutes notice to the world of its existence." Wine Ry. Appliance Co. v. Enterprise Ry. Equipment Co., 297 U.S. 387, 393 (1936) ("Wine Railway"); see also Sontag Chain Stores Co. v. National Nut Co., 310 U.S. 281, 295 (1940) ("Sontag Chain Stores"); Sessions v. Romadka, 145 U.S. 29, 51 (1892); Boyden v. Burke, 55 U.S. 575, 584 (1852). Bolton and Spireas invoke the literal meaning of this language to argue that Plaintiff must be charged with knowledge of the Liquisolid Patents as a matter of law on the dates they issued, whether or not Plaintiff actually did have such knowledge.

The cases relating to the constructive notice of a patent's existence do not bear the weight Defendants place on them. The Federal Circuit has confronted what significance, if any, to accord this language in the context of suits brought by purported co-inventors to correct the inventorship of a patent under 35 U.S.C. § 256. The questions presented in inventorship cases are analogous to those presented here. An inventorship action may be brought at any time during the life of the patent, but a purported inventor may be estopped under the doctrine of laches from

contesting inventorship for his unreasonable delay in doing so.  See Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc., 988 F.2d 1157, 1161-62 (Fed. Cir. 1993).  The Federal Circuit has held that under the equitable doctrine of laches, the period of a purported inventor's "delay is measured from when the claimant had actual notice of the claim or would have reasonably been expected to inquire about the subject matter."  Id. at 1161.

In Advanced Cardiovascular the lower court granted a motion to dismiss on the basis of laches after calculating the period of delay running from the date the patent issued.  Id.  The district court explicitly relied on Sontag Chain Stores, 310 U.S. at 295, and its statement that because "[a]ll patents must be recorded, together with the specifications, in the Patent Office in books to be kept for that purpose[,] [c]onstructive notice of their existence goes thus to all the world."  Advanced Cardiovascular, 988 F.2d at 1161-62 (quotation omitted).  The district court in Advanced Cardiovascular took the view, advanced by Defendants in this case, that the claimant had notice of the patents, as a matter of law, and thus the facts underlying his inventorship claim, on the date the patents issued.  Id.

On appeal, the Federal Circuit explicitly repudiated this argument, holding that "Sontag Chain Stores harbors no principles applicable to laches.  *Constructive notice is not an appropriate substitute for the determination of reasonableness or excuse for delay*."  Id. at 1162 (emphasis added).  Analogizing the application of laches in an inventorship suit to the application of laches to a patentee's suit for infringement, the court explained that while certain provisions of patent law involve constructive notice, where equitable considerations come into play, actual knowledge of the existence of a plaintiff's claim, or of facts supporting a duty of inquiry, is required.  Id.  In stating that the period of delay cannot "start while the potential claimant remains ignorant that a cause of action has arisen," the court rejected the argument

advanced by Defendants here, and held that mere issuance of a patent does not give a potential claimant notice of the patent's existence for purposes of determining whether the potential claimant exercised diligence in protecting his rights.   Id.

Though Defendants cite cases in which federal district courts have read Wine Railway and Sontag Chain Stores in the literal manner they suggest, the court is unpersuaded by their reasoning and declines to adopt it.[25]   In M & T Chemicals, Inc. v. International Business Machines Corp., 403 F. Supp. 1145, 1148 n.4 (S.D.N.Y. 1975), the court properly applied New York law in rejecting plaintiff's argument that its conversion claim should run from the date it discovered the conversion, instead of the date the conversion was completed.   However, in dicta the court went on to cite Sontag Chain Stores and stated, in the alternative, that the plaintiff had imputed knowledge of the patent and thus discovered the conversion on the date it was issued. Id.   In Rodgard Corp. v. Miner Enterprises, Inc., 914 F. Supp. 907, 925 (W.D.N.Y. 1995), aff'd in part, rev'd in part, 108 F.3d 1394 (Fed. Cir. 1997) (unpublished table decision), the plaintiffs alleged that the defendants fraudulently induced them to agree to a contract intended to preserve plaintiffs' trade secrets while defendants simultaneously filed a patent application relying on those same trade secrets; and defendants asserted the statute of limitations as a defense.   The court reasoned that when the patent containing the same trade secrets issued, "the world had constructive notice of its existence and contents.   There is no evidence that the plaintiffs could not have obtained actual notice of the fraud with due diligence, and this Court does not find that

---

[25]      This court is not the first to react with skepticism to the argument that the Sontag Chain Stores/Wine Railway dicta should be applied literally in the statute of limitations context.   See Applera Corporation-Applied Biosystems Group v. Illumina, Inc., No. C 07-02845 WHA, 2008 WL 927963, at *1-2 (N.D. Cal. Apr. 4, 2008) (collecting cases) ("[Wine Railway] had no occasion to calibrate when publication of a patent would or would not serve as constructive notice for statute of limitations purposes or any other purpose beyond the immediate holding of the case. For our purposes, it was a dictum."); Univ. of Colorado Foundation, Inc. v. American Cyanamid, 880 F. Supp. 1387, 1405-06 n.4 (D. Colo. 1995) ("The Supreme Court's dicta in [Sontag Chain Stores] and other cases cited by Cyanamid to the effect that the issuance of a patent is notice to the world for certain purposes, do not support the conclusion that such issuance is notice for all purposes, including the statute of limitations."), rev'd on other grounds, 196 F.3d 1366 (Fed. Cir. 1999).

the plaintiffs reasonably investigated such. They are charged with such knowledge." Id. Accordingly the court held that plaintiffs could reasonably have "discovered" the fraud on the date the patent issued. Id.

In M & T and Rodgard the courts reflexively accepted the Sontag Chain Stores language as a literally correct statement of the law, without considering whether doing so was an appropriate extension of the language from the substantive context in which it appears in Sontag Chain Stores and Wine Railway. In Advanced Cardiovascular the court carefully considered whether the underlying substantive law to which laches would apply in that case, 35 U.S.C. § 256, would be advanced by imputing knowledge of the patents to the plaintiff, or whether a different standard was more appropriate. See, e.g., 988 F.2d at 1161-62 ("This knew-or-should-have-known criterion is appropriate to actions to correct inventorship. It is in harmony with the patent statute . . . ."). The Federal Circuit determined that imputing notice of patent existence would not advance the substantive policies embodied in the underlying substantive patent law to which the doctrine would have applied. Id. Moreover, the court found that imputing notice was particularly inappropriate in determining equity where the doctrine would disadvantage an otherwise innocent party "wholly ignorant [of claims] whose existence he had no reason to apprehend." Id. (quoting Halstead v. Grinnan, 152 U.S. 412, 417 (1894)).

As Wine Railway, Sontag Chain Stores, and Advanced Cardiovascular demonstrate, the applicability of the principle of constructive notice of a patent, if it exists at all, is inextricably intertwined with the specific policy objectives fundamental to the underlying substantive federal patent law. The federal policy concerns implicit in the Supreme Court's application of constructive notice to the underlying substantive federal law at issue in the cases cited by Defendants—i.e., the defense of intervening rights to patent infringement (Sontag Chain Stores,

310 U.S. at 294-95), and the patent marking statute (<u>Wine Railway</u>, 297 U.S. at 393; <u>Sessions</u>,

145 U.S. at 50)—are simply not implicated in cases like this one, where the court must apply

state law.  Accordingly, no principle of federal law applicable to this action requires the court to

impute notice of the Liquisolid Patents to Plaintiff simply by virtue of their issuance by the PTO.

        b.        <u>Constructive Notice of Patent Issuance under New York State Law</u>

Because patents have the attributes of personal property, <u>see</u> 35 U.S.C. § 261, the transfer

of patents and property rights of individuals in patents are governed by state law.  <u>Stanford</u>, 583

F.3d 832, 841 (Fed. Cir. 2009).  Accordingly, actions to vindicate property rights in patents are

subject to state statutes of limitations, and state law doctrines determining when a limitations

period may be tolled.  <u>See</u> <u>Stanford</u>, 583 F.3d 832, 846-48 (Fed. Cir. 2009) (applying California

statute of limitations and discovery rule to patent ownership claims); <u>Stark v. Advanced</u>

<u>Magnetics, Inc.</u>, 29 F.3d 1570, 1577-78 (Fed. Cir. 1994) (applying Massachusetts law governing

equitable tolling of statute of limitations in considering effect of patent issuance on Plaintiff's

knowledge); <u>Applera Corporation-Applied Biosystems Group v. Illumina, Inc.</u>, No. C 07-02845

WHA, 2008 WL 927963, at *1-2 (N.D. Cal. Apr. 4, 2008) (applying California law in

considering effect of patent issuance on Plaintiff's knowledge for purposes of discovery under

state statute of limitations); <u>Univ. of Colorado Foundation, Inc. v. American Cyanamid</u>, 974 F.

Supp. 1339, 1353-56 (D. Colo. 1997) (applying Colorado fraudulent nondisclosure and equitable

tolling law), <u>rev'd on other grounds</u>, 196 F.3d 1366 (Fed. Cir. 1999); <u>K-Tek Corp. v. Lovett</u>, 924

F. Supp. 57, 59 (M.D. La. 1996) (applying Louisiana law in considering application of Louisiana

prescription statute, and explicitly rejecting <u>Wine Railway</u> and <u>Sontag Chain Stores</u> as

inapplicable to question of state law).  Because Defendants invoke constructive notice of the

Liquisolid Patents to defeat Plaintiff's claim to equitable tolling of New York statutes of

limitations and trigger the fraud discovery accrual rule on the date of the Liquisolid Patents' issuance, the issue is controlled by New York State law, and the court must determine whether a New York court would impute knowledge of the Liquisolid Patents' existence to Plaintiff.

The standard adopted in Advanced Cardiovascular for determining whether a potential claimant knew or should have known of his cause of action or that he has been defrauded is, for all intents, identical to that employed by New York courts in determining whether a plaintiff had notice of his claim sufficient to defeat equitable tolling or would, through reasonable diligence, have discovered that he was being defrauded. For much the same reasons Advanced Cardiovascular rejected the Sontag Chain Stores dictum's applicability to the equitable doctrine of laches in an inventorship suit, the court finds that a doctrine imputing notice of the Liquisolid Patents on the date of issuance would be similarly inconsistent with the doctrine of equitable tolling or the application of the fraud discovery accrual rule under New York law.

In articulating the principle underlying the doctrine of equitable tolling, the New York Court of Appeals has looked to Supreme Court precedent and the "'the maxim that no man may take advantage of his own wrong.'" General Stencils, Inc. v. Chiappa, 18 N.Y.2d 125, 127-28 (1966) (quoting Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 232-233 (1959)). A defendant who intentionally conceals facts forming the basis of a plaintiff's claims is no less wrong for having done so, and a plaintiff is no less diligent in protecting his rights, if the plaintiff remains wholly ignorant of evidence of wrongdoing he had no reason to detect—even where that evidence exists in a public record open to all. See Advanced Cardiovascular, 988 F.2d at 1161-62 (quoting Halstead, 152 U.S. at 417 (1894) ("'[T]here can be no laches in failing to assert rights of which a party is wholly ignorant, and whose existence he had no reason to apprehend.")).

The Supreme Court has stated that "the law imputes knowledge when opportunity and interest, combined with reasonable care, would necessarily impart it. Not to improve such opportunity, under the stimulus of self-interest, with reasonable diligence, constitutes laches which in equity disables the party who seeks to revive a right which he has allowed to lie unclaimed from enforcing it, to the detriment of those who have, in consequence, been led to act as though it were abandoned." Wanlass v. General Elec. Co., 148 F.3d 1334, 1338 (Fed. Cir. 1998) (quoting Wollensak v. Reiher, 115 U.S. 96, 99 (1885)). This principle is also an accurate statement of New York law governing constructive notice of the contents of public records. New York courts impute knowledge of the contents of a public record to a party when the party has actual knowledge of facts giving it reason to believe that it has an interest in the contents of the records, and a reasonably prudent person with such an interest would investigate those records if given an opportunity to do so. See Citicorp Trust Bank, FSB v. Makkas, 67 A.D.3d 950, 953 (2d Dep't 2009) ("The failure to ascertain that an allegedly fraudulent conveyance has occurred through the inspection of public records is not a basis for imputing knowledge of the fraud in the absence of circumstances that would require the plaintiff to investigate."); Gudej v. Dana, 11 A.D.3d 368, 368 (1st Dep't 2004) ("The mere fact that deeds had earlier been recorded was insufficient to constitute constructive notice of the [fraudulent] conveyances in the absence of some knowledge that would have required plaintiffs to investigate the public records."); Azoy v. Fowler, 57 A.D.2d 541, 542 (2d Dep't 1977) (holding plaintiff's failure to investigate public record did not constitute failure to exercise reasonable diligence in discovering alleged fraud where circumstances would not lead a person of ordinary suspicion to investigate public record).

Plaintiff has repeatedly alleged that it had no knowledge of the Liquisolid Patents or their relationship to the Defendants' research at St. John's until November 2008, at which time it

promptly demanded performance of Defendants' obligations under the Agreements.  For the most part, Defendants do not argue that Plaintiff was aware of circumstances that should have caused it to investigate the public records of the PTO to determine whether Defendants had obtained patents related to research performed at St. John's.  Defendants argue instead, that Plaintiff should be charged with knowledge of the Liquisolid Patents simply by virtue of their existence.  New York courts impute knowledge of the contents of a public record only where a reasonable person would have investigated it.  Therefore, it is appropriate to frame Defendants' argument in terms of the duty they assert a reasonable person in Plaintiff's position would be under if this court were to accept their argument.  Defendants would have this court hold that a "reasonably diligent" or "ordinarily suspicious" university has a duty to review all patents issued by the PTO to all former students, faculty, and staff, in the absence of any information suggesting it has an interest in the contents of the patents issued, or that such patents will reveal evidence it is being defrauded.

This degree of watchfulness is not required by New York law.  Defendants have not directed the court to a reasoned opinion in which a court has found that a "reasonable person" or a "person of ordinary suspicion" has a continuing duty to monitor a public record in the absence of any information which should trigger the person's interest in the record, on the off-chance that it might reveal evidence that he has been defrauded.  Therefore, the court finds that New York law does not require the imputation of knowledge of the Liquisolid Patents to Plaintiff in this case.

c.      Inquiry Notice

In the alternative, Defendants, point to one fact that might have put St. John's on inquiry notice of its claims to the inventions or of Bolton's and Spireas's intended fraud.  Defendants

argue that Spireas's submission of his dissertation and oral defense put St. John's on inquiry notice of its rights to the research disclosed in the dissertation. (Bolton Mem. at 7 n.5; Spireas Mem. at 8 n.4, n.5; Spireas Reply at 8 n.20.)

The determination whether a plaintiff was "possessed of knowledge of facts from which it could [] reasonably have inferred . . . the alleged fraud" is "[o]rdinarily . . . a mixed question of law and fact." Erbe v. Lincoln Rochester Trust Co., 3 N.Y.2d 321, 326 (1957). And "[w]here it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts." Citicorp Trust Bank, 67 A.D.3d at 953 (quotation omitted); In re Integrated Resources, 815 F. Supp. at 638 (holding that summary judgment on question of inquiry notice is warranted only in the "extreme circumstances" that the undisputed facts in the record allow the court to "readily impute knowledge of a probable fraud . . . without having to assume the role of the jury and undertake a detailed deductive analysis of the factual record"); see also General Bedding Corp. v. Echevarria, 947 F.2d 1395, 1397-98 (9th Cir. 1991) (where parties did not dispute patent issuance was notice to the world of patent existence, court could not "conclude, as a matter of law, that a reasonable person would necessarily investigate when confronted with [defendant's] patent").

Even if the court accepts as true the proposition that Spireas's dissertation fully disclosed to St. John's[26] the nature and findings of the research he conducted, it is not necessarily clear that this alone was sufficient to satisfy Bolton's and Spireas's fiduciary duties to disclose material facts relating to the inventions. Not all research disclosed in dissertations is valuable or patentable, and the court cannot conclude from the mere fact of the submission of the dissertation

_____

[26] The parties have not briefed the question whether disclosure to the members of the faculty panel reviewing the dissertation and hearing the oral defense would be sufficient to constitute notice *to St. John's*, and the court does not reach this issue.

to the St. John's faculty review panel that a reasonable person on the faculty panel reviewing it would have known that the research was valuable and should have acted accordingly. It is even more difficult for Defendants to argue that the dissertation and oral defense put St. John's on notice of Bolton's and Spieras's fraud. There is nothing inherently fraudulent about submitting and defending a dissertation, and in the absence of evidence that the dissertation demonstrated Defendants' wrongful intent to appropriate the research for their own ends, the court cannot conclude that an ordinarily suspicious person on the faculty review panel would have been placed on notice of Defendants' fraud. But the import of Spireas's purported disclosure is a question of fact the court cannot resolve on a motion to dismiss. Because the parties contest the nature and significance of the facts disclosed in the dissertation and oral defense, the court cannot conclude on a motion to dismiss that the dissertation and oral defense should have placed St. John's on inquiry notice of its claims, or that it was being defrauded.

Taking Plaintiff's factual allegations as true, the court finds that the first day on which Plaintiff could with reasonable diligence have discovered it was being defrauded and the facts forming the basis of its claims, was the day on which it was alerted of the similarities between Spireas's doctoral dissertation and the Liquisolid Patents. That date was in or around November 2008. For those claims that do not sound in fraud, including the contract, tortious interference with contract, conversion, and unjust enrichment claims, Plaintiff has alleged facts sufficient to invoke equitable tolling of the applicable statutes of limitations until November 2008, and Defendant's motions to dismiss these claims as untimely must be denied. Plaintiff's claims subject to the fraud discovery accrual rule, including Plaintiff's fraudulent concealment, fraudulent conveyance, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty

claims, are also timely because Plaintiff originally filed this action within two years of November 2008.

## III.    CONCLUSION

Nearly every defense raised by Defendants implicates a question of fact that cannot be resolved by the court on a motion to dismiss.  While it is entirely possible that Defendants will be able to establish their entitlement to summary judgment on some or all of these defenses following discovery, the court cannot say that Plaintiff's sixty-one page Complaint is legally insufficient.  The court advises the parties that it will permit each only one motion for summary judgment at the close of discovery.  If upon reviewing the motions for summary judgment the court concludes that there are genuine issues of material fact in dispute, the court will move expeditiously to trial and will expect the parties to be prepared accordingly.

For the foregoing reasons, Defendants' motions to dismiss are DENIED.  Defendants shall answer the Complaint by January 10, 2011, and the parties shall proceed with discovery forthwith.

SO ORDERED.

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　/s/ Nicholas G. Garaufis
Dated: Brooklyn, New York                                NICHOLAS G. GARAUFIS
　　　　December 10, 2010                                United States District Judge